*[handwritten top right:] Set I No Fee    Cat 3    NO IFP*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GLAVIN IVY,                                    : CIVIL ACTION

      Petitioner                            : Case No. _1:23-CV-0069_

-v-                                            :

COMMONWEALTH OF PENNSYLVANIA;                  : Petition for Writ of Habeas Corpus
SECRETARY OF PENNSYLVANIA'S
DEPARTMENT OF CORRECTIONS;                     : Pursuant to 28 U.S.C. $2254
SUPERINTENDENT OF SCI-FOREST;
MERCER COUNTY DISTRICT ATTORNEY,               :

      Respondents                           :

*[stamp:] RECEIVED*

*MAR 15 2023*

*CLERK, U.S. DISTRICT COURT*
*FOR THE WESTERN DISTRICT*
*OF PENNSYLVANIA*

PETITION FOR A WRIT OF HABEAS CORPUS

BY A PRISONER IN STATE CUSTODY

GLAVIN IVY NA-8177
SCI-FOREST
PO BOX 945
1 Woodland Drive
Marienville, PA 16239

DATED: *3-9-23*

BY: _____
      Petitioner, Glavin Ivy

I. TABLE OF CONTENTS

II.  PRELIMINARY STATEMENT ...................................... ...1

III. PROCEDURAL HISTORY ........................................ ...2

    A.  Factual Summary .......................................... ...3

    B.  Trial .................................................... ...4

    C.  Post-Sentence Evidentiary Hearing ........................ ...9

    D.  Direct Appeal ........................................... ..10

    E.  PCRA Proceedings ........................................ ..10

IV.  STATEMENT OF EXHAUSTION AND TIMELINESS ..................... ..12

GROUND I: Petitioner was denied due process of law, the right to a
fair trial, and the right to the effective assistance of
counsel where the prosecution engaged in misconduct by
making knowingly false statements to the state courts that
it was in possession of incriminating evidence for the
purpose of deceiving the state courts to admit otherwise
inadmissible character evidence pursuant to Pa.R.E. 404(b)
and where trial counsel failed to investigate and defend
against these false statements, and where appellate counsel
waived Petitioner's 404(b) issue on appeal in violation
of the U.S. Constitution and its laws ......................... ..13

    A. These Misrepresentations Are In Fact False and the
       Prosecution Had Knowledge of Their Falsity at the
       Time They Were Made ..................................... ..16

    B. The State Courts Relied Upon These Misrepresentations
       When Ruling the 404(b) Evidence Admissible at
       Petitioner's Criminal Trial ............................. ..18

    C. The Commonwealth Achieved its Goal in Using the 404(b)
       Evidence for its Prejudicial Impact as Impermissible
       Character Evidence Depriving Petitioner a Fair Trial .... ..19

    D. Trial Counsel Rendered Ineffective Assistance of Counsel
       and Trial Counsel's Conduct Amounted to Incompetence .... ..19

    E. Appellate Counsel Rendered Ineffective Assistance of
       Counsel for Waiving Petitioner's 404(b) Claim on Appeal
       that of which Amounted to Incompetence .................. ..21

    F. Petitioner was Prejudiced by Trial Counsel and
       Appellate Counsel's Errors and Absent these Errors, the
       Outcome would have been Different ....................... ..25

<u>GROUND II</u>:  Petitioner was deprived due process of law, the right to
a fair trial, and the right to effective assistance of
counsel where the prosecution knowingly used the false
testimony of 404(b) witness Caitlin Dobran, presented
fabricated evidence in the form of an audio recording,
where the Commonwealth suppressed prior statements of 404(b)
witness Caitlin Dobran in violation of <u>Brady v. Maryland</u>,
where counsel failed to object to the false testimony and
fabricated evidence, where counsel failed to investigate
can call witnesses Melissa Trollman, Mike Rhoades, and
Andy Frank, and where trial counsel failed to effectively
cross-examine 404(b) witness Caitlin Dobran at trial in
violation of the U.S. Constitution and its laws        ...26

    A. C.D. Presented False Testimony Concerning the Three
       Most Important Incidents C.D. Claimed To Be Victimized  ...29

      I.   April 10th/11th, 2014                              ...29

        i.   Chiropractor Records                          ...31

        ii.  April 22nd Rib Dislocation                    ...33

        iii. April 11th Audio Recording (Fabricated
            Evidence)                                     ...34

        iv.  April 11th Text Messages Exchanged Between
            C.D. and Petitioner

      II.  April 20th through April 22nd, 2014            ...37

        i.   C.D.'s Testimony and Other Evidence Places
            C.D. and Petitioner In Two Places At Once
            On April 20th, 2014                           ...37

      III. April 21st, 2014                              ...39

        i.   I.P. Address 71.126.42.167 Was Assigned to a
            Physical Address Other Than Petitioner's House
            At the Relevant Time                          ,,,40

      IV.  The Commowealth Violated Brady v. Maryland
          by Withholding Prior Statements Made By
          Caitlin Dobran                                ...42

        i.   The Snyder Report Was Suppressed By The
            Commonwealth                                  ...44

        ii.  The Snyder Report Was Material                ...44

      V.   May 1st                                        ...45

    B. Caitlin Had A Clear Motive For Testifying Falsely
      and For Falsely Incriminating Petitioner           ...47

C. Caitlin Dobran Ultimately Recanted Her Trial Testimony After The Trial In This Case Which Prompted The Commonwealth to Nolle Pross All 49 Charges Against Petitioner In A Separate Case ...50

D. Alternatively, Trial Counsel Was Ineffective For Failing To Object To The Commonwealth's Knowing Use Of False Testimony and For Failing To Effectively Cross-examine C.D. ...51

E. Trial Counsel Was Ineffective For Failing To Call Defense Witnesses Melissa Trollman, Mike Rhoades, and Andy Frank ...52

    i.   Melissa Trollman ...52

    ii.  Mike Rhoades ...53

    iii. Andy Frank ...53

F. Trial Counsel's Conduct In This Regard Amounted To Incompetence ...54

G. Petitioner Was Prejudiced By Counsel's Conduct ...57

GROUND III: Petitioner was deprived due process of law, the right to a fair trial, and the right to effective assistance of counsel where the prosecution knowingly used the false testimony of Amanda Carroll and where trial counsel failed to object to said false testimony and where trial counsel failed to effectively cross-examine Amanda Carroll at trial in violation of the U.S. Constitution and its laws ...59

A. Trial Counsel Was Ineffective For Failing To Effectively Cross-Examine Amanda Carroll ...60

    i.   Evidence That A.C. Never Alleged To Have Been Raped By Petitioner ...60

    ii.  The Timeline of Events Were Critical to the Elements of the Crimes Charged and to The Jury's Verdict Of Guilt ...62

    iii. A.C.'s Testimony That She Felt Like She Had No Choice But To Consent to Sexual Intercourse Was Unreasonable Under The Circumstances ...64

B. Trial Counsel's Failure to Object to A.C.'s False Testimony and Failure to Effectively Cross-examine A.C. Amounted to Incompetence ...65

C. Petitioner Was Prejudiced By Trial Counsel's Conduct In This Regard ...67

GROUND IV:  Petitioner was denied the effective assistance of counsel
where trial counsel failed to effectively cross-examine the
Commonwealth's expert, Dr. Eric Vey, where trial counsel
failed to investigate and call an expert on behalf of the
defense to challenge the Commonwealth's medical evidence,
and where trial counsel represented to the jury that the
bruising on A.C.'s neck were caused by the lifting of
cardboard boxes or from hot plastic which was inconsistent
with the explanation provided by Petitioner, in violation of
the U.S. Constitution and its laws                              ...68

      A. The Issue Of Causation                                 ...70

          i.   The "Usual Signs" of Manual Strangulation Were
               Not Present                                      ...72

          ii.  Petechial Hemorrhages- A Usual Sign Also Not
               Present                                          ...72

          iii. Evidence Adduced At Trial Proved That There Was
               No Occlusion Of The Blood Flow                   ...73

          iv.  Discoloration Of The Bruises Reveal That The
               Bruises Were Made Before The Crimes Were Alleged
               To Occur                                         ...74

      B. The Existence Of A Risk of Death Not Present And Was
         Critical To The Elements Of Aggravated Assault         ...75

      C. Alternative Theories of Causation Advanced By Trial
         Counsel Prejudiced The Defense                         ...77

      D. Trial Counsel's Conduct Amounted To Incompetence       ...77

      E. Petitioner Was Prejudiced By Counsel's Conduct In
         This Regard                                            ...79

GROUND V:   Petitioner was denied his 14th Amendment right to have a
jury determine his guilt beyond a reasonable doubt of every
fact necessary to constitute the crimes of Rape by Forcible
Compulsion (or threat thereof), Kidnapping, and Attempted
Aggravated Assault and Petitioner was denied his right to
effective assistance of counsel where appellate counsel filed
a constitutionally inadequate brief on appeal in regards to
Petitioner's sufficiency claims and where trial counsel
failed to advance a challenge to Pennsylvania's Rape Statute
on grounds that the statute was void-for-vagueness as applied
to the facts of this case in violation of the U.S. Constitution
and its laws                                                    ...81

      A. Rape By Forcible Compulsion or Threat Thereof          ...81

          i.   The Rape Statute Is Void-For-Vagueness As
               Applied to the Facts of This Case                ...83

    B. Attempted Aggravated Assault ...83

    C. Kidnapping ...84

    D. Trial and Appellate Counsel's Conduct Amounted to Incompetence ...85

    E. Petitioner Was Prejudiced By Trial and Appellate Counsel's Failures ...87

GROUND VI: Petitioner was denied his right to effective assistance of counsel, the right to a fair trial and to due process, the right to prepare a full defense, his right to make an informed decision whether or not to testify in his defense, and his right to assist in his own defense where the prosecution enforced a policy that conditioned discovery upon the understanding that no case related documentation would be left in the possession of Petitioner and where trial counsel failed to adequately review discovery with Petitioner nor object to the enforcement of said policy which interfered with trial counsel's assistance in violation of the U.S. Constitution and its laws ...88

    A. Trial Counsel's Conduct Lacked Any Strategic Basis And Amounted To Incompetence ...90

    B. Cronic And Strickland Prejudice ...90

        i. In Joint Conspiracy With The Prosecution, Trial Counsel Used This Policy To Railroad The Petitioner And Ensure Petitioner's Conviction ...91

        ii. Even If Trial Counsel Did Not Conspire Against Petitioner, This Policy Negatively Impacted Petitioner's Right To Counsel and Decision To Not Testify In His Own Behalf ...96

           a. This Policy Had A Prejudicial Impact Upon Trial Counsel's Pretrial Investigations And Fact Finding Efforts ...97

           b. This Policy Undermined The Fostering Of Trust Between Counsel And Petitioner Which Was Critical To The Attorney-Client Relationship ...99

           c. This Policy Had A Negative Impact Upon Petitioner's Decision Whether Or Not To Testify ...100

REQUEST FOR AN EVIDENTIARY HEARING ...101

PRAYER FOR RELIEF ...101

VERIFICATION ...101

v

## II. PRELIMINARY STATEMENT

1.    COMES NOW, Petitioner Glavin Ivy, acting pro se, and petitions
this Court to issue a writ of habeas corpus ordering his release from
custody of the Commonwealth of Pennsylvania Department of Correction.
Petitioner's confinement is in violation of the Constitution of the United
States. First, Petitioner was denied due process of law, the right to a fair
trial, and the right to the effective assistance of counsel where the
prosecutor engaged in misconduct by making knowingly false statements to the
state courts that it was in possession of incriminating evidence for the
purpose of deceiving the state courts to admit otherwise inadmissible
character evidence pursuant to PA.R.E. 404(b), where trial counsel failed
to investigate and defend against these false statements, and where appellate
counsel waived Petitioner's 404(b) issue on appeal. Second, Petitioner was
denied a fair trial, due process of law, and the right to the effective
assistance of counsel where the prosecution knowingly used the false testimony
of 404(b) witness Caitlin Dobran (hereinafter "C.D."), presented fabricated
evidence in the form of an audio recording purported to be a confession made
by Petitioner, suppressed prior statements of 404(b) witness C.D. in
violation of Brady v. Maryland, and where trial counsel failed to effectively
cross-examine 404(b) witness C.D. and call certain witnesses at trial to
challenge C.D.'s testimony. Third, Petitioner was denied a fair trial, due
process of law, and the right to the effective assistance of counsel where
the prosecution knowingly used the false testimony of complainant Amanda
Carroll (hereinafter "A.C.") and where trial counsel failed to effectively
cross-examine A.C. at trial. Fourth, Petitioner was denied the effective
assistance of counsel where trial counsel failed to effectively cross-examine
the Commonwealth's medical expert, failed to call a rebuttal expert, and

1

where trial counsel represented to the jury a theory of causation that was inconsistent with explanations provided by Petitioner, all of which pertained to purported strangulation injuries photographed upon the neck of complainant A.C.. Fifth, Petitioner was denied his fourteenth amendment right to have a jury determine his guilt beyond a reasonable doubt of every fact necessary to constitute the crimes of Rape by Forcible Compulsion, Kidnapping, and Attempted Aggravated Assault and Petitioner was denied his right to the effective assistance of counsel where trial counsel failed to object to the application of Pennsylvania's rape statute to the facts of this case on grounds that the statute is void-for-vagueness as applied and where appellate counsel failed to advance constitutionally adequate arguments on direct appeal regarding Petitioner's sufficiency claims. Sixth, Petitioner was denied his right to effective assistance of counsel, the right to a fair trial, the right to prepare a full defense, and his right to assist in his defense where the prosecution enforced a policy that conditioned discovery upon the understanding that no case-related documentation would be left in the possession of Petitioner and where trial counsel failed to adequately review discovery with Petitioner in preparation for trial and where trial counsel failed to object to the enforcement of said policy which interfered with trial counsel's assistance.

### III.  PROCEDURAL HISTORY

Petitioner Glavin Ivy was sentenced on March 14th, 2017, to an aggregate sentence of not less than (19) nor more than (60) years in prison. Underlying that sentence, Petitioner was convicted following a jury trial of Rape by Forcible Compulsion, Kidnapping, Attempted Aggravated Assault, Unlawful Restraint, and Simple Assault as set forth in the Bill of Information.

## A. Factual Summary

3.    On November 20th, 2014, Glavin Ivy was arrested and charged with Rape by Forcible Compulsion (18 §3121(a)(1)), Kidnapping (18 §2901(a)(3)), Aggravated Assault (18 §2701(a)(1)), Unlawful Restraint (18 §2902(a)(1)), and Simple Assault (18 §2701(a)(1)). The Bill of Information was formally filed on Feb. 2, 2015 at docket CP-43-CR-0001780-2014, within the Mercer County Court of Common Pleas.

4.    On April 28, 2015, the Commonwealth filed an "Application for Search Warrant and Authorization" seeking the entirety of Petitioner's FACEBOOK.com (social media) records. This application was granted by the state court on the same date.

5.    On May 8th, 2015, the Commonwealth filed an "Application for Access to Transactional Records of an Electronic Communication Service" seeking to obtain an extraction report of Petitioner's cellular phone. This application was granted by the state court on the same date.

6.    On June 24, 2015, trial counsel filed a "Written Motion to Offer Evidence of Complainant's Past Consensual Sexual Conduct and Non-sexual Conduct". This motion was granted by the state court on July 7th, 2015.

7.    On June 26th, 2015, the Commonwealth filed a "Motion and Notice of Intent to Introduce Evidence of other Crimes Pursuant to PA.R.E. 404(b)(2)". This motion was granted in part and denied in part on July 31, 2015. After the Commonwealth's motion to reconsider, this order was reinstated by the state court on September 10, 2015.

8.    On September 25, 2015, the Commonwealth filed an interlocutory Notice of Appeal of the court's September 10, 2015 order. Trial counsel filed a cross-appeal on October 8, 2015.

9.    On August 19, 2016, by way of opinion docketed at 1575-WDA-2015,

the Superior Court reversed the appealed portion of the court's order.

B. Trial

10. The 3-day trial commenced on November 16th, 2014, and can be summarized as follows:

Deloris Carroll, who is the mother of complainant Amanda Carroll, was the Commonwealth's first witness. Mrs. Carroll testified that on the day after the alleged crimes on November 19, 2014, A.C. arrived at her house and showed her marks located upon A.C.'s neck. T.T. Vol N.T. 37  Mrs. Carroll testified that she thought the marks were "caused from somebody grabbing her." Id. at 40  and that she drove A.C. to the police station to file a report. Upon cross, trial counsel questioned Mrs. Carroll about her knowledge of A.C.'s employment and implied that A.C. may have received the marks from the lifting of boxes. Id. at 44

Detective Mark Hynes was the Commonwealth's second witness. Mr. Hynes testified that he was notified of a female who wanted to file an assault report on 5:15 p.m. on November 19, 2014. Id. at 47  Mr. Hynes testified he observed the marks on A.C.'s neck and photographed them. Id.  Trial counsel declined to conduct any cross-examination of Mr. Hynes.

The attorneys then met at side bar to discuss the admissibility of the audio recording made by 404(b) witness C.D. on April 11th, 2014. Id. at 49  Trial counsel did not object to the admission of the audio recording.

Other bad acts witness Caitlin Dobran, a former romantic partner of the

4

Petitioner, was the third witness to testify at Petitioner's trial, consisting of 98 pages worth of transcription. In sum, C.D. testified that she was in a relationship with Petitioner for two months and that she met Petitioner at church. Id. at 58-59   C.D. described her initial impression of the Petitioner as "a very good godly man", "an excellent guitar player" and "very intelligent". Id. at 60   C.D. continued testifying that "he was like offering all of this knowledge and lifting me up, encouraging me both in singing and in my faith... He was just very charming." Id.   C.D. then described a change in the nature of the relationship and testified to approximately eight separate incidents where she was beaten and raped by the Petitioner over a two month period. Upon cross, trial counsel showed the jury pictures taken of C.D. and the Petitioner. Id. at 118-121   Trial counsel crossed C.D. about her education. Id. at 122   C.D. testified she lived with her parents during March, April, and May of 2014. Id. at 126 (C.D.'s testimony will be addressed in greater detail later in this petition)

On the second day of trial, complainant Amanda Carroll was the Commonwealth's fourth witness. T.T. Vol II N.T. 3   A.C. testified that she engaged in consensual sex with Petitioner multiple times. Id. at 6   A.C. testified that she had hoped her and Petitioner could be together for an extended period of time. Id.   A.C. testified that at 12:15 p.m. on November 18th, 2014, she received a Facebook message from the Petitioner expressing discontent over a picture of A.C. with her ex-boyfriend and that Petitioner was dumping her. Id.   A.C. testified that she and Petitioner had a long discussion whereby Petitioner said "very mean, hateful things." Id. at 7   Although the Petitioner tried to end the conversation twelve times, that A.C. kept the conversation going because she "was hoping we

could patch things up, talk about it and sort everything out." Id. at 15

A.C. testified that she arrived at Petitioner's house at 6:42 p.m. on November 18, 2014. Id. at 35  A.C. was then asked to go further in time, to the point when she left the Petitioner's house after the alleged crimes. Id.  A.C. testified that she left the Petitioner's house at 3:00 a.m. and then sent Petitioner four positive text messages on each and every one of her breaks from work. Id. at 35-36  A.C. testified that she and the Petitioner had plans to meet again two days later, on Thursday, November 20th, 2014. Id. at 38  A.C. testified she arrived at her parent's house on November 19th, 2014, and told her mother that "I think we have a hitter." Id. at 42  After being directed back to the night of the alleged crimes, A.C. testified that when she arrived at Petitioner's house that night, that Petitioner put his hands out asking for a hug and invited her in to talk. Id. at 49  Once in Petitioner's bedroom, and after talking for approximately "15 to 20 minutes", A.C. testified Petitioner struck A.C. with the back of his hand. Id. at 52  A.C. testified she was struck a second time on the bridge of her nose. Id.  A.C. testified that the next thing she knew, the Petitioner reached down and started to choke her for 30 seconds until A.C. asked Petitioner to stop, at which time he let go. Id.  A.C. described the amount of pressure applied to her neck as "an extreme amount of pressure" and that Petitioner grabbed her with enough force that the upper half of her body was raised off the bed, Id. at 53  A.C. testified that as she was being choked, she thought she wouldn't make it out alive, and that Petitioner was going to kill her. Id. at 54  A.C. testified that she didn't know why she thought that but assumed that "to put your hands around someone's neck" meant an intent to kill. Id. at 54  A.C. testified that as she started to cry, that Petitioner stopped and apologized. Id. at 55  A.C. testified that things

calmed down after that. Id. at 56   A.C. testified that after joking and talking, the Petitioner asked her if she wanted to have sex and she agreed. Id. at 56   A.C. testified that she then left the bedroom to use the bathroom located across the hallway. Id.   A.C. testified that Petitioner left the bedroom to socialize with his roommates who were present during the entire night. Id. at 57   A.C. testified that when the Petitioner returned they both went to sleep and at 3:00 a.m., A.C. left for work. Id. at 59   A.C. testified that as A.C. left, Petitioner was loving and caring. Id.   Upon cross-examination, A.C. testified that she was madly in love with Petitioner. Id. at 67   A.C. testified that later in the evening, around 11:00 p.m., A.C. and Petitioner began talking and laughing with each other. Id. at 76   A.C. testified that she had told Jason (Petitioner's roommate) that the Petitioner gave her a hickey. Id. at 79   A.C. testified that she began intercourse in the dominant position by mounting the Petitioner. Id. at 84   Upon redirect, A.C. testified that Petitioner never choked her out "just for fun". Id. at 99   Upon examination by the Court, A.C. testified that when she was choked by the Petitioner, she did not lose consciousness at all. Id. at 104   A.C. testified that she did not got to the hospital, seek urgent care, and didn't need medical attention. Id.

Forensic Pathologist Dr. Eric Vey was the Commonwealth's fifth witness. Id. at 107   Dr. Vey testified that his role in the case was to determine if the photographs portraying bruising on A.C.'s neck were "compatible" with the written reports of the Commonwealth's three witnesses. Id. at 116   Dr. Vey testified that his final determination was that the injuries were consistent with the events that were put forth in these written reports/statements. Id. at 116-117   Dr. Vey testified that he

arrived at this result based on the accuser's accusation that she had difficulty breathing and difficulty speaking while being choked by Petitioner. Id. at 117   Dr. Vey testified that the photographs revealed three contusions located, anterolaterally, on the victim's neck. Id. at 117-118   Dr. Vey testified as to the size of these bruises. Id. at 117 Dr. Vey testified that the location of the marks were characteristic of those seen in strangulation cases. Id. at 118   Dr. Vey testified that unconsciousness occurs in 10-15 seconds after pressure is applied to the neck which is sufficient to completely block the blood flow to and from the brain. Id. at 122   Dr. Vey testified that death from strangulation will occur "eventually". Id. at 123   Upon cross-examination, Dr. Vey conceded that he did not do a medical examination or an internal examination of anybody in the case. Id.   Trial counsel then questioned Dr. Vey about the use of the plural "hands" within his written report. Dr. Vey explained that this was a typographical error. Id. at 124 Trial counsel ceased any further cross-examination of Dr. Vey.

Mariah Diraimondo, who was Petitioner's other roommate and who was present for the majority of the night in question, was the Commonwealth's sixth witness. Mrs. Diraimondo testified that on November 18th, 2014, that she arrived home from work at about 9:30 p.m. Id. at 128   Mrs. Diraimondo testified that as she came home from work she heard, coming from the bedroom, A.C. and Petitioner laughing, talking, and heard the guitar a few times. Id. at 129

Captain Jeffrey Wiscott was the Commonwealth's seventh witness. Id. at 159   Mr. Wiscott testified that he came across a "rape and kidnapping" report that was taken on the afternoon of November 19th, 2014, by

8

Corporal Mark Hynes. Id. at 160-161    Mr. Wiscott testified he interrogated the Petitioner upon his arrest and that this interrogation was recorded. Id. at 167-168    The jury heard the recorded interrogation of the Petitioner. Id. at 169    Upon cross-examination, Mr. Wiscott testified that Jason Wright said nothing that would be helpful to the Petitioner. Id. at 181 Mr. Wiscott then testified that Jason Wright told him that Mr. Wright (who was present the entirety of the alleged criminal episode) overheard no fighting or commotion, that he saw A.C. exit the bedroom atleast once without Petitioner, and that Mr. Wright observed hickey marks on A.C.'s neck on a prior weekend. Id. at 185-186    Upon recross, Mr. Wiscott testified that A.C. never stated she was not free to leave the room. Id. at 195-196

On Day 3 (last day) of the trial, Forensic Psychologist Dr. Veronique Valliere was the Commonwealth's eigth and final witness. T.T. Vol III N.T. 10    Dr. Valliere testified about "counterintuitive behavior", i.e. that victims of assault may act in different ways than how people would expect them to. Id. at 16    Dr. Valliere testified that she intended to provide "general education" and knew nothing about the facts of the case. Id. at 17

At the close of the Commonwealth's case, trial counsel declined to call any witnesses or put forth any evidence on behalf of the defense. Id. at 44

C.  Post-Sentence Evidentiary Hearing

11.  After trial counsel filed post-sentence motions, Petitioner was appointed new counsel, Matthew C. Parson, 1270 Liberty Street, Franklin, PA 16323. Upon Petitioner's request, Attorney Parson obtained an evidentiary hearing

that took place on June 30, 2017, where Attorney Parson called Petitioner as the sole witness.

12.  In sum, Petitioner testified about his lack of access to the case file and discovery in this case.  Petitioner testified about his concerns regarding prosecutorial misconduct within this case but could not specify how the evidence and case file supported his concerns due to Petitioner's inability to obtain case-related documentation. Attorney Parson (hereinafter "Appellate Counsel") put forth no supporting evidence to corroborate Petitioner's testimony and the presiding judge (Judge Christopher St. John) denied any relief on this basis.

### D.  Direct Appeal

13.  An appeal was timely lodged and docketed at 1328-WDA-2017. However, on July 17th, 2018, the Superior Court of Pennsylvania dismissed the appeal based upon Appellate counsel's failure to file a brief.

14.  On August 2nd, 2018, the lower court reinstated Petitioner's appellate rights nunc pro tunc.

15.  Petitioner's direct appeal nunc pro tunc was docketed at 1178-WDA-2018. On July 30, 2019, the Superior Court denied Petitioner's appeal but remanded the case for resentencing after reversing, sua sponte, application of the Pennsylvania's Sexual Offender Registration and Notification Act ("SORNA"), as unconstitutional based upon a change in Pennsylvania law.

### E.  PCRA Proceedings

16.  On February 12, 2020, Petitioner filed his "Petition for Post-Conviction Relief Pursuant to 42 Pa.C.S.A. §9543" However, the Court had to first resolve the issue of sentencing and set a hearing for March 27, 2020.

17.  At the March 27, 2020, hearing the lower court reinstated Petitioner's sentence and permitted Petitioner to proceed pro se during his PCRA proceedings.

18.  Petitioner filed an Amended Petition on July 6, 2020.

19.  Petitioner conducted a six-day PCRA evidentiary hearing where he presented several witnesses and 51 exhibits. These hearings took place on August 18, 2020 (Day 1), August 20, 2020 (Day 2), September 2, 2020 (Day 3), October 1, 2020 (Day 4), October 8, 2020 (Day 5), and October 15, 2020 (Day 6).

20.  Petitioner learned of new evidence during the course of the PCRA evidentiary hearings and subsequently sought leave to amend his PCRA petition, that of which was granted. Petitioner filed his Second Amended Petition on October 20, 2020.

21.  On May 17, 2021, the lower court denied Petitioner's PCRA petition as amended.

22.  On June 9, 2021, Petitioner filed a timely notice of appeal that was docketed at 685-WDA-2021.

23.  Of note, despite the scope of review being that the Superior Court of Pennsylvania review the record as a whole including all properly admitted exhibits (See Comm. v. Widmer, 560 Pa. 308, 744 A.2d 745, 753 (Pa. 2000)), the Appellate Court reviewing Petitioner's PCRA appeal did not review any of the 51 PCRA exhibits Petitioner properly admitted in the lower court.

24.  Petitioner filed a "Motion to Supplement/correct the record on appeal pursuant to Pa.R.A.P. 1926" with the lower court on 9-29-21, which was denied.

25.  Petitioner filed an "Application for Correction of the Certified Record on Appeal" with the Superior Court pursuant to Pa.R.A.P. 123 and Pa.R.A.P. 1926 on September 13, 2021 and an Amended Application on September 16, 2021, which was denied on September 17, 2021.

26.  Petitioner filed another Application to Correct the record with the

Superior Court on October 4, 2021, which was denied on October 8, 2021.

27.  The Superior Court, by way of opinion and order, denied Petitioner's
PCRA appeal on May 24, 2022.

28.  Petitioner then filed a motion for reargument and en banc review with
the Superior Court which was denied on August 2, 2022. The time to file a
Petition for Allowance of Appeal to the Pennsylvania Supreme Court expired on
September 2nd, 2022.

## IV.  STATEMENT OF EXHAUSTION AND TIMELINESS

29.  "A one year period of limitation shall apply to an application for a
writ of habeas corpus by a person in custody pursuant to the judgment of a state
court." 28 U.S.C. §2241(d)(1)   "The limitation period shall run from" "the date
on which the judgment became final by the conclusion of direct review or the
expiration of the time for seeking such review[.]" Id. at §2244(d)(1)(A)
"The time during which a properly filed application for state post-conviction...
review" is "pending shall not be counted" against the one year period. Id. at
§2244(d)(2)   Petitioner filed the instant petition within one year of his
conviction becoming final and during which his state court proceedings were
pending. Petitioner's conviction became final on April 27, 2020, (30) days
after the lower court reinstated Petitioner's sentence pursuant to the Superior
Court's remanded opinion. The Petitioner filed his PCRA petition prematurely
on February 12, 2020, however the lower court conducted PCRA proceedings upon
reinstatement of Petitioner's sentence on March 27, 2020, and permitted
Petitioner to pursue PCRA relief. See Adams v. Huntingdon, 2020 U.S. Dist.
LEXIS 73852 (3d Cir. 2020)(A PCRA Petitioner filed a pro se PCRA petition
prematurely before the Superior Court's dismissal of his direct appeal, the
federal district court stated "[a]t no time, however, did the PCRA court conclude

that Petitioner's PCRA petition was prematurely filed. Instead, the PCRA court accepted Petitioner's PCRA petition, appointed counsel, and granted several extentions of time for counsel to file an amended petition.")  Likewise, because the lower court accepted Petitioner's PCRA petition and went forward with the PCRA proceedings, no time has lapsed at that time in regards to the one-year limitation governing federal habeas corpus proceedings. Therefore, Petitioner has until September 2nd, 2023, to file the instant petition and the instant petition is timely.

30.  All of the issues contained within the instant Petition were included in PCRA Petition before the lower court and were presented to the Superior Court on appeal. Therefore, Petitioner has exhausted his state court remedies.

### GROUND I

31.  <u>Petitioner was denied due process of law, the right to a fair trial, and the right to the effective assistance of counsel where the prosecution engaged in misconduct by making knowingly false statements to the state courts that it was in possession of incriminating evidence for the purpose of deceiving the state courts to admit otherwise inadmissible character evidence pursuant Pa.R.E. 404(b) and where trial counsel failed to investigate and defend against these false statements, and where appellate counsel waived Petitioner's 404(b) issue on appeal in violation of the U.S. Constitution and its laws.</u>

32.  Pennsylvania Rule of Evidence 404(b) bars evidence of other bad acts because it has the tendency to invite the jury to improperly and unfairly infer guilt based upon the accused's propensity to commit crime.

33.    However, there are exceptions to Pa.R.E. 404(b) that permit evidence of other bad acts when there is a legitimate need to prove an issue or fact in dispute. Such a legitimate need renders the probative value of the other bad acts greater than its prejudicial impact to the Defendant.

34.    Under Pennsylvania law, the Commonwealth must provide the Defendant notice that they intend to introduce 404(b) evidence and which exceptions they intend to invoke. See Pa.R.E. 404(b)(3)    The Commonwealth then has the evidentiary burden of proving that such exception is applicable to permit admissibility.

35.    On June 26th, 2015, A.D.A. Lauren Hackett authored and filed the "Commonwealth's Motion and Notice and Intent to Introduce Evidence of other crimes pursuant to Pa.R.E. 404(b)." On July 24th, 2015, A.D.A. Lauren Hackett filed the C.W.'s "Memorandum in Support of its 404(b) Motion."

36.    At paragraph 97 (found on page 21 and 22 of her 404(b) Motion), A.D.A. Lauren Hackett identified which exceptions she intended to invoke and what evidence she sought to be admitted as follows and in relevant part:

"In the instant case, the Commonwealth is seeking to use the following prior bad acts of the Defendant to show a common plan scheme and design, intent and knowledge of criminal wrongdoing, and the chain or sequence of events showing the complete history of the case:

(a) Testimony and supporting evidence from Caitlin Dobran describing the verbal, physical, and sexual abuse she encountered at the hands of the Defendant during their two-month relationship. Supporting evidence includes:

   i. Facebook Instant Messenger Correspondence and text message correspondence between Caitlin Dobran and the Defendant between March, 2014 and May, 2014.

   ii. An audio recording of a conversation between Caitlin Dobran and the Defendant on April 11, 2014, in the state of Ohio.

   [iii]. Medical records from Caitlin's chiropractor reflecting dates of appointments wherein she had her rib treated, which corresponds with dates of physical abuse: April 11, 2014 and April 22, 2014.

(b) A certified copy of Caitlin Dobran's Protection From Abuse

14

Order granted on May 20, 2014.

(c) Certified copies of the Defendant's two violations of Caitlin's Protection From Abuse Order, which reflect convictions on August 13, 2014 and March 26, 2015.

...

(h) A certified copy of Amanda Carroll's Protection From Abuse Order granted on December 16, 2014.

(i) A certified copy of the Defendant's violation of Amanda's Protection From Abuse order, reflecting a conviction from October 14, 2014."

37. Within her 404(b) Motion and Memorandum, A.D.A. Hackett revealed the following information which is true:

"During the course of the investigation, the FACEBOOK account of the Defendant was obtained, and it revealed that the Defendant joined a group on FACEBOOK called 'Physiognomy', which is the study or art of identifying the personality and inner-character traits of another, simply by examining the physical features on a person's face." See e.g. C.W.'s 404(b) Motion at 80

38. To meet her burden under 404(b)(3) and, in support of her "Common scheme, plan, or design" theory of admissibility, A.D.A. Hackett falsely asserted the following within her 404(b) Motion and Memorandum:

"The Defendant's affiliation with Physiognomy on FACEBOOK demonstrates the sophistication with which the Defendant has trained himself in a calculated, methodical, predator-like manner to identify a certain type of victim, such as one who possesses a more fragile personality type that would respond submissively to violence." C.W.'s 404(b) at 98(e) AND;

"Even more compelling in our case, however, is the methodology and sophistication by which the Defendant selects his victims. Unlike any of the cases cited, our Defendant exercises extreme care in selecting who he will violate. The pursuit begins with the Defendant's study of Physiognomy, as conveyed on his FACEBOOK account, and shows that the Defendant has trained himself how to identify a certain type of victim who will respond submissively to violence." See 404(b) Memorandum page 15

39. To meet her burden under 404(b)(3) and in support of her "Consciousness

15

of Guilt" theory of admissibility, A.D.A. Lauren Hackett falsely asserted that:

> "Defendant was convicted of violating Amanda's Protection From Abuse Order before the Honorable Robert G. Yeatts on January 14th, 2015, because he asked a third party- Mariah Diraimondo- to ask Amanda Carroll questions about her pending criminal charges; <u>specifically requesting that Amanda withdraw the criminal charges against the Defendant or fail to attend the preliminary hearing."</u>(emphasis added) See <u>C.W.'s 404(b) Motion at ¶44</u>

## A.  These Misrepresentations Are in fact False and the Prosecutor had Knowledge of Their Falsity at the Time They Were Made

40.  A.D.A. Lauren Hackett intentionally and/or knowingly made these misrepresentations to meet her evidentiary burden because she believed the Commonwealth's case against Petitioner hinged upon the admission of this 404(b) evidence. A.D.A. Hackett averred that the Commonwealth could not obtain Petitioner's conviction for the rape of A.C. without the testimony of C.D.. See <u>C.W.'s 404(b) Motion at ¶101</u>

41.  During the PCRA evidentiary hearings below, and to prove these representations had no basis in fact and were false, Petitioner admitted into evidence <u>PCRA Exhibit 3,4, and 5</u> (which was the entirety of the FACEBOOK records consisting of 758 pages), <u>PCRA Exhibit 8</u> (which was an audio recording of Detective Wiscott's police interview of Mariah Diraimondo which led to the initiation of PFA violation charges and proceedings), <u>PCRA Exhibit 9</u> (which was the PFA violation transcript of the hearing that took place on Jan. 14, 2015), and <u>PCRA Exhibit 49</u> (which was the affidavit of probable cause charging Petitioner with the relevant PFA violation).

42.  The entirety of evidence related to "Physiognomy" is contained on pages (1) and (10) of the 768-page FACEBOOK record. These pages simply show that on July 30th, 2014 (about two month's <u>after</u> the allegations of C.D.), that Petitioner's friend, Doc Adams, sent the Petitioner an innocuous

invitation to a "group" (FACEBOOK's term for a chatroom) and Petitioner "joined" that group by clicking "accept" on his computer screen. Upon accepting the invitation on FACEBOOK- FACEBOOK, as a matter of rountine, publicly displays that the user has "joined" the group. See attached Appendix "A"

43. There is simply no evidence within the FACEBOOK records of a correlation between "Physiognomy" and any crime.

44. A.D.A. Hackett personally and successfully applied for a search warrant for Petitioner's FACEBOOK records and was the prosecutor who provided these documents to trial counsel.

45. In her 404(b) Motion, A.D.A. Hackett extensively quoted from the FACEBOOK records, indicating that she thoroughly reviewed the records for incriminating evidence. Because the FACEBOOK records contain no justification for A.D.A. Hackett's representations, A.D.A. Hackett must have known her statements lacked any basis in fact and were false.

46. As proven by the charging affidavit, the Jan. 14, 2015 transcript, and the police interview of Mariah Diraimondo, the referenced PFA violation proceeding bore no relation to any attempt on behalf of Petitioner to persuade A.C. not to appear in court or withdraw the criminal charges, nor was this an allegation underlying that proceeding. See attached Appendix "A"

47. A.D.A. Hackett knew this statement was false because she personally prosecuted the relevant PFA violation proceeding and was present upon the record during the Jan. 14, 2015 hearing, when that proceeding was resolved. A.D.A. Hackett had first-hand knowledge that that PFA violation stemmed from an allegation that Petitioner sent Mariah Diraimondo a letter requesting that she investigate whether A.C. reported to police that she was raped by Petitioner. This is further evidenced by PCRA Exhibit 8, where Mariah Diraimondo informed Detective Wiscott of this fact. (See audio at 9:30)

17

**B.  The State Courts Relied Upon These Misrepresentations When Ruling the 404(b) Evidence Admissible at Petitioner's Criminal Trial**

48.  A.D.A. Hackett ultimately succeeded in invoking three exceptions to Pa.R.E. 404(b): (1) the "common-plan-scheme-or-design" exception, (2) the "consciousness-of-guilt" exception, and (3) the "Res Gestae" exception. The common-scheme theory was applied only to the admission of C.D.'s testimony and supporting evidence (including the April 11th, audio). The consciousness-of-guilt theory and the Res Gestae theory applied only to evidence pertaining to the PFA violations.

49.  On September 10th, 2015, Judge Yeatts entered a pretrial order allowing C.D. to testify at Petitioner's trial and permitted an audio recording of a conversation between C.D. and Petitioner that took place on April 11th, 2014. This order also excluded the admission of the PFA violations on the basis that they were unduly prejudicial.

50.  In Judge Yeatt's 404(b) opinion filed on August 18th, 2015, page 11, he states:

> "This tends to show that Defendant enters into relationships with women that are similarly submissive to abusive behavior, which supports the Commonwealth's theory that Defendant uses Physiognomy to methodically choose his victims... While the evidence may paint Defendant in a negative light, this prejudice is not enough to outweigh the probative value of demonstrating Defendant's methology and tactics in picking submissive women as abuse victims."(emphasis added)

51.  The Commonwealth filed an interlocutory appeal from this order and on August 19th, 2016, the Superior Court issued an opinion reversing the order of Judge Yeatts relying upon the false statements asserted by A.D.A. Hackett and championed throughout the appeal process. (See pages 16, 17, 18, 19, and 22 of that opinion)

C.  The Commonwealth Acheived its Goal in Using the 404(b) Evidence
    for its Prejudicial Impact as Impermissible Character Evidence
    Depriving Petitioner a Fair Trial

52.  At Petitioner's trial, no argument or evidence was presented to the
jury regarding the C.W.'s Physiognomy theory and Consciousness-of-Guilt theory
despite the C.W.'s success in having this evidence admitted for these purposes.

53.  The jury was only instructed as to the common scheme exception to
Pa.R.E. 404(b). However, because the C.W.'s Physiognomy theory was the
purported common scheme, the C.W.'s failure to put forth evidence or argument
regarding Physiognomy reduced the purported common scheme evidence to mere
inadmissible character evidence.

54.  During the PCRA proceedings below, the Commonwealth conceded they
used the 404(b) evidence to show Petitioner's propensity to commit a general
class of crime by arguing that it needed the 404(b) evidence to show that
Petitioner's behavior was "not an isolated incident." See Page 9 of the C.W.'s
Answer to Petitioner Glavin Ivy's First Petition for Collateral Relief

55.  Because no Pa.R.E. 404(b) exception applied, rendering this evidence
admissible, this evidence had no probative value towards proving a fact or issue
in dispute beyond the impermissible character inferences regarding Petitioner's
propensity to commit crime, that of which was unduly prejudicial to the
Petitioner depriving him of due process of law and the right to a fair trial.

D.  Trial Counsel Rendered Ineffective Assistance of Counsel and Trial
    Counsel's Conduct Amounted to Incompetence

56.  Trial counsel's conduct in regards to the 404(b) evidence was not
the result of a tactical choice but rather the result of a failure to

comprehend and research the governing law. Trial counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker.

57.  Although trial counsel objected to the 404(b) evidence by filing a generic Motion in Limine, this Motion in Limine was a cursory attempt at challenging the evidence and merely detailed what evidence was objected to and cited only to the governing rules of evidence.

58.  Unlike the Commonwealth's attorney, trial counsel filed no supporting brief, nor argued upon the record in support of his Motion in Limine, despite the existence of strong case-law against admissibility. Trial counsel testified that this was a "mistake". PCRA Evi. Hearing Day 1 N.T. 61

59.  At the time the 404(b) fraud was taking place, trial counsel admitted upon the record that he had not even reviewed the FACEBOOK material being relied upon by the Commonwealth to support its theories of admissibility. See Transcript of 404(b) Hearing of July 10, 2015 N.T. 4   This explains why trial counsel testified that he had no reasonable basis for failing to object to the prosecutorial misconduct herein set forth. PCRA Evi. Hearing Day 1 N.T. 31 Trial counsel testified he did not read the FACEBOOK records prior to trial. Id.

60.  Trial counsel testified that even after reviewing the Commonwealth's 404(b) motion at ¶80, he didn't understand what it meant, Id. at N.T. 28, didn't know what their physiognomy theory was, Id. N.T. 51, but admitted that physiognomy "sounds like pseudoscience to me." Id. N.T. 51

61.  At the very least, applicability of Pa.R.E. 404(b) would have fell upon the factual similarities between the allegations of C.D. and those of A.C., those of which were highly dissimilar. Trial counsel testified "I made a mistake" by not arguing the factual dissimilarities between C.D. and A.C.'s allegations. Id. N.T. 61

62.  In regards to the PFA violations, trial counsel had available to him avenues for challenging the PFA violations that did not rely upon Pa.R.E. 404(b).

Trial counsel testified that he read the PFA violation orders Id. N.T. 22, was aware that the PFA violations were the result of no-contest pleas Id. N.T. 23, but was not aware Pa.R.E. 410(a)(2) barred evidence of pleas of no-contest from being admitted at other proceedings and had no basis for failing to object under Pa.R.E. 410. Id. N.T. 25-26

63.    Although trial counsel was partially successful in that the PFA violations were excluded at the lower court level, this success was undone by trial counsel's incompetence on interlocutory appeal. Moreover, the testimony of C.D. and the April 11th, audio were not excluded, which were the most prejudicial evidence sought to be admitted.

64.    After the Commonwealth filed an interlocutory appeal seeking to have the PFA violations admitted, trial counsel filed a procedurally improper "cross-appeal" under Pa.R.A.P. 311 and such "cross-appeal" was quashed by the Superior Court on this basis. (See Opinion pages 26-29)

65.    Alarmingly, trial counsel testified that he knew that he had to seek permission to appeal from the trial court pursuant to Pa.R.A.P. 1311 and had no basis for not doing so. PCRA Evi. Hearing Day 1 N.T. 54

E.    Appellate Counsel Rendered Ineffective Assistance of Counsel for
      Waiving Petitioner's 404(b) Claim on Appeal that of which Amounted
      to Incompetence

66.    On page 26 of its Opinion during the interlocutory appeal at 1575-WDA-2015, the Superior Court expressly left open the door for Petitioner to challenge the 404(b) issue on direct appeal. The Superior Court stated:

> "In this situation, if Appellee ultimately is convicted, the trial
> court's decision to admit the evidence can be reviewed through
> Appellee's right to a direct appeal; thus, the claim will not be
> lost." (emphasis in original)

67. Although trial counsel preserved the Pa.R.E. 404(b) challenge in his post-sentence motions, appellate counsel waived the issue on appeal by not raising it within his concise statement of issues raised on appeal or within his appellate brief. This was not the result of a strategic choice designed to protect Petitioner' interests.

68. During the post-sentence period, appeallate counsel visited with Petitioner at the county jail where he reviewed with Petitioner, and had Petitioner execute, appellate counsel's "Amended Post-Sentence Motion", that of which incorporated by reference the 404(b) issue raised by former counsel. Petitioner questioned appellate counsel regarding this as follows:

> "But based on my signature, it would appear that I wanted the claims raised by Mr. Gilchrest [i.e. the 404(b) claim] and the additional claims that you raised?
>
> A.    Right." PCRA Evi. Hearing Day 3 N.T. 169

69. At the PCRA evidentiary hearing, Day 3, Petitioner directly questioned appellate counsel as to whether Petitioner asked him to waive the 404(b) issue on appeal and direct appeal counsel answered evasively. Although essentially blaming Petitioner for his errors, direct appeal counsel would not explain how his conversations with Petitioner led him to believe Petitioner wanted this 404(b) claim waived nor that Petitioner wanted him to pursue one claim over another. PCRA Evi. Hearing Day 3 N.T. 169-207

70. In truth, appellate counsel misunderstood that Petitioner sought to expose the prosecutorial misconduct that led to the admission of the Pa.R.E. 404(b) evidence, and that the two issues were one in the same.

71. Further evidence of Petitioner's communication with appellate counsel about what issues Petitioner wanted raised on appeal can be found in the transcript of the post-sentence evidentiary hearing of June 30th, 2017, where Petitioner testified about what issues he wanted to preserve on appeal and where attorney

Parson conducted the hearing. The following testimony took place:

> "THE COURT: So you're alleging that at hearings held prior to trial on the 404(b) motion that there was prosecutorial misconduct.
>
> [Petitioner]: Yes..." Id. N.T. 11

72.    Petitioner further testified "And pretrial in other hearings to get certain evidence admitted into my criminal trial." Id. "I'm also talking about the pretrial 404(b) motion that was submitted to Judge Yeatts and then [...] to the appellate court and these falsified facts were used to get favorable rulings from the court which also prejudiced my trial." Id. N.T. 12

73.    Petitioner testified at N.T. 46 as follows:

> "The 404-- I didn't even know anything about the facts in the 404(b) motion until I wrote the Superior Court a couple times and then had Kelly Moore call them and they sent me this. And this was a month before my trial in 2016.
>
> THE COURT: And this is the Opinion of the Superior Court.
>
> [Petitioner]: Right. And there's falsified facts in there. I didn't get to read the 404(b) motion..."

74.    On page 35-36 of this transcript, the Petitioner testified as follows:

> "the physiognomy issue, I didn't get to finish on that. Just to be-- just so the court knows, there is no evidence whatsoever that I trained myself to identify submissive victims and I would encourage the prosecution to provide some kind of evidence of that. That was clearly something that came out of Wiscott's or whoever, Hackett's, imagination. I think that that it is wrong and unlawful for them to say that-- because what that did was that proved-- that proved their argument about the common scheme, okay. If I trained myself to identify submissive victims thats evidence of common scheme. Otherwise--
>
> THE COURT: Was there a witness at trial that testified as to that?
>
> [Petitioner]: No. But it-- no. But it was used to get Caitlin in on my case.
>
> THE COURT: How?
>
> [Petitioner]: By-- through, umm, the 404(b) motion submitted by Hackett. There was a list of facts, a lot of them were false, that Yeatts then turned around and allowed Caitlin to testify based on that-- these

falsified facts. And Caitlin being a perjuring witness, umm, was then-- prejudiced my trial."

75.  Appellate counsel, being present for this hearing, heard Petitioner's testimony as to exactly what issues Petitioner wanted to pursue on appeal and the facts underlying the prosecutorial misconduct in the 404(b) context.

76.  Nonetheless, despite appellate counsel's attempts to blame Petitioner for his errors, appellate counsel has a constitutional obligation to assess which claims are available, meritorious, and to pursue those claims he views as such, irregardless of the will of the client. See Supporting Brief

77.  Curiously, appellate counsel testified that once he began to represent Petitioner, Petitioner complained to him that he wished to view the discovery and that Petitioner felt he did not have real and meaningful access to the material. PCRA Evi. Hearing Day 2 N.T. 95 and Day 3 N.T. 170

78.  As if both appellate counsel and Petitioner were going into the direct appeal blind, appellate counsel testified to not having Petitioner's case file, discovery, nor transcripts of the trial until "way after the appeal." PCRA Evi. Hearing Day 2 N.T. 107-108  Because of this, appellate counsel testified that he had to rely on his communications with Petitioner and on Petitioner's knowledge of the case to determine which issues to raise on appeal. Id. N.T. 108

79.  This explains why appellate counsel did not advise Petitioner that the stand-alone prosecutorial misconduct claims were waived and why appellate counsel waived the 404(b) claim.

80.  Although appellate counsel excused his errors by claiming to have limited time to prepare due to his late appointment, appellate counsel initially failed to file an appellate brief which caused Petitioner's appeal to be dismissed and later reinstated nunc pro tunc, effectively allowing appellate counsel additional time to prepare and review the case file.

24

### F.  Petitioner was Prejudiced by Trial Counsel and Appellate Counsel's Errors and Absent these Errors, the Outcome Would Have Been Different

81.  Petitioner was prejudiced by the admission of the 404(b) evidence because the 404(b) evidence was impermissible character evidence that invited the jury to find the Petitioner guilty of the rape of A.C. based upon the testimony of C.D., i.e. that C.D. was repeatedly and brutally raped by Petitioner.

82.  The testimony of C.D. left an insurmountable impression upon the jury, arousing within the jury a overmastering hostility towards Petitioner and inflaming the jury's emotions against the Petitioner for the duration of the trial likely rendering the jury incapable of fairly weighing the evidence.

83.  This 404(b) evidence rendered the trial fundamentally unfair because the jury was likely incapable of considering the 404(b) evidence for the limited purpose for which the Judge instructed, i.e. to show a common scheme, this is especially so because the Commonwealth presented no evidence of a true common scheme.

84.  Petitioner was denied due process of law where highly prejudicial evidence was admitted despite being inadmissible pursuant to Pa.R.E. 404. Had there been an applicable exception to the 404(b) Rule, the Commonwealth would have no need to resort to fraud in support of their theories of admissibility.

85.  The Commonwealth acknowledged its case against Petitioner left room for the jury to find a reasonable doubt where A.C. told Petitioner she wanted to have sex, failed to allege force or verbal threats of force to compel A.C. to engage in sexual intercourse, and A.C. failed to directly state she was raped.

86.  The prosecutor capitalized on the impermissible character inferences raised by C.D.'s testimony by arguing to the jury in closing that: (1)"This is who he is. This is his controlling side. Caitlin spoke about this controlling side, as well. Would we expect him to act in any other way but mean, vengeful,

25

and hateful?" T.T. Last Day N.T. 72-73, and (2) "The Defendant's anger escalated in a way which Caitlin described it would. Id. N.T. 74

87.    Petitioner was further prejudiced by Appellate counsel's waiver of the 404(b) issue because Petitioner was likely to receive a new trial, without the testimony of C.D., had the issue been properly raised and argued on appeal. The 404(b) evidence was inadmissible under Pennsylvania law because there was no legitimate reason for the evidence, raising its prejudicial impact far above any probative value. See Supporting Brief

GROUND II

88.    Petitioner was deprived due process of law, the right to a fair trial, and the right to effective assistance of counsel where the Prosecution knowingly used the false testimony of 404(b) witness Caitlin Dobran, presented fabricated evidence in the form of an audio recording, where the Commonwealth suppressed prior statements of 404(b) witness Caitlin Dobran in violation of Brady v. Maryland, where counsel failed to object to the false testimony and fabricated evidence, where counsel failed to investigate and call witnesses Melissa Trollman, Mike Rhoades, and Andy Frank, and where trial counsel failed to effectively cross-examine 404(b) witness Caitlin Dobran at trial in violation of the U.S. Constitution and its laws.

89.    More than (6) months prior to the alleged crimes underlying this case, C.D. filed a police report (7-page handwritten statement admitted below as PCRA Exhibit 46) which resulted in Petitioner's arrest for two simple assaults alleged to have occurred on April 11th, 2014, and May 1st, 2014 (See Mercer County Docket at 855-CR-2014).

26

90.  While these charges were pending, C.D. filed a Petition for a
Protection From Abuse Order and on May 20th, 2014, a hearing was held where C.D.
testified under oath about her allegations. Petitioner represented himself. See
May 20th, 2014 Transcript admitted as PCRA Exhibit 10

91.  On August 13th, 2014, a PFA violation hearing was held where C.D.
again testified extensively under oath and where Petitioner represented himself.
See August 13th, 2014 Transcript admitted as PCRA Exhibit 19

92.  C.D. made no sexual allegations against Petitioner throughout these
proceedings.

93.  On October 14th, 2014, the simple assaults were nol-prossed based
upon the prosecuting attorney's assessment that C.D. was incredible, unreliable,
and could not provide details surrounding the assaults nor specify when and how
she was attacked by Petitioner. See Transcript of Tyler Heckathorne's Sworn
Testimony N.T. 58 admitted as PCRA Exhibit 18, See also PCRA Evi. Day 3 N.T. 77-79

94.  According to the Supplemental Narrative of Detective Edward Stabile,
Det. Stabile unsuccessfully attempted to contact C.D. at her residence on
11-20-2014, at 12:41, before Petitioner's arrest, and left a business card
requesting C.D. contact Lt. Wiscott or Det. Stabile. See Initial PCRA filings
entered upon the record on 2-12-2020 and 3-12-2020; See also Appendix "B"

95.  On November 20th, 2014, at 7:56 p.m. (within a few hours of
Petitioner's arrest involving A.C.), C.D. communicated to Melissa Trollman
(C.D.'s close friend) that "I'm leading the brigade against him. The cops have
asked me to help show that this is a pattern of behavior." ... "I'm going to
do ALL I CAN to make sure he isn't able to do this to someone else." (emphasis
in original) See PCRA Exhibit 35

96.  According to the Supplemental Narrative of Det. Stabile dated 11-25-14,
on Friday, November 21, 2014, at approximately noon (the day after Petitioner's
arrest), C.D. appeared at the Sharon Police Station and spoke to Det. Stabile

about the Petitioner. Id.

97.  According to this Supplemental Narrative, C.D. "did later send three emails to Sgt./Det. Stabile." These emails are contained in Appendix "B" herein attached. See also Initial PCRA filings on 2-12-2020 and 3-12-2020 at docket 1780-CR-2014 and PCRA Exhibit 6  Of note, neither during C.D.'s in-person interview with Sgt./Det. Stabile on Nov. 21, 2014, nor the emails C.D. sent to Sgt. Stabile this same day, did C.D. make allegations that she was raped by Petitioner.

98.  In the first email sent on November 21, 2014, to Det. Stabile and Lt. Wiscott (PCRA Exhibit 6), C.D. informed these officers that "I am also willing to testify about the pattern of behavior. ANYTHING that will prevent other girls from getting hurt." (emphasis in original)

99.  Petitioner asserts that by communicating to police that she was willing to testify about "ANYTHING", C.D. was alerting the police that she was willing to commit perjury at Petitioner's trial.

100. Understanding what C.D. intended to do, Melissa Trollman contacted Petitioner's trial counsel via a series of emails admitted below as  PCRA Exhibit 35 (Petitioner first learned of the content of these emails during the PCRA evidentiary hearings). Mrs. Trollman informed trial counsel of the following:

> "Caitlin claims she is leading the brigade against Glavin. When she speaks of doing all she can to make sure he stays in jail, I do believe that includes lying as I've known her to do. After speaking with a friend of Glavin's who claimed Caitlin asked her to go to Court and lie about several things Glavin did, I further believe Caitlin is setting Glavin up in dishonest ways so it is impossible to prove his innocence." page 14

101. Pursuant to the police request to help show a "pattern of behavior", in December of 2014 (at Petitioner's preliminary hearing of this case), C.D., for the first time, submitted a fresh handwritten statement (admitted below as PCRA Exhibit 12) alleging numerous sex crimes premised upon the same timeframe

as C.D.'s previously dismissed simple assault case.

## A.  C.D. Presented False Testimony Concerning the Three Most Important Incidents C.D. Claimed to be Victimized

102. Although Petitioner asserts the entirety of C.D.'s incriminating testimony at trial was outright false, Petitioner focuses on (3) of the (10) incidents that provide the most evidentiary support of their falsity, and those of which were the most severe allegations made by C.D., that is: C.D.'s allegations regarding April 10th/11th, 2014; April 20th, through to the 22nd, 2014; and May 1st, 2014.

## I.  April 10th/11th, 2014

103. Prior to trial, and during trial, C.D. misrepresented minor swing-dance injuries (caused from the thrusting and pulling motions inherent in this form of dance) to be instead, caused by Petitioner's assault upon C.D. in her car on the ride home from that swing-dance.

104. Moreover, to support her trial testimony, C.D. furnished the prosecution team with an audio recording of a conversation that occurred between C.D. and Petitioner on that car ride home on April 11th, 2014. At trial, this audio was presented to the jury as fabricated evidence that Petitioner confessed to assaulting C.D. in the car ride home because Petitioner apologized for "hurting" C.D. and C.D. testified the audio was made immediately after the alleged assault within her vehicle. As with all the evidence C.D. claimed corroborated her allegations about the assault within her vehicle, the entire conversation captured on this audio pertained exclusively to what transpired at the swing-dance.

105. In C.D.'s original handwritten statement of May 9th, 2014, admitted as <u>PCRA Exhibit 46</u>, C.D. placed a star over the section describing the assault in her vehicle and wrote "jerked my arm really, hard, popped rib out of place." There is no mention of the swing-dance within this 7-page document.

106. At the PFA hearing of May 20th, 2014, when asked by her attorney what injuries she suffered as a result of the assault within her vehicle, C.D. testified under oath that "I hurt my head and he had done something to my arm and rib." <u>PCRA Exhibit 10 N.T. 20</u>

107. At trial, C.D. testified that her and Petitioner attended a swing-dance with a group of friends from church on April 10th, 2014, at a bar called "Cedars" located in Youngstown, Ohio. C.D. further testified that on the car ride home at approx. 1:00 a.m. on April 11th, 2014, Petitioner abruptly yanked the steering wheel of C.D.'s vehicle, causing the vehicle to veer off the road. C.D. testified that Petitioner then grabbed her hair and slammed her head into the side window. C.D. testified that Petitioner grabbed her knife, that C.D. used martial arts to disarm Petitioner, and that Petitioner finally ceased the assault once C.D. invoked the name of Jesus Christ. <u>T.T. Vol I N.T. 75-76</u>

108. C.D. then testified that her and Petitioner entered the vehicle to continue the drive home, and that C.D. audio recorded a conversation her and Petitioner were having during the rest of the drive home to Petitioner's house. This audio recording, had a duration of approx. 45 minutes. <u>Id. Vol I N.T. 77</u> <u>Commonwealth's Exhibit 6</u>

109. After dropping Petitioner off at his house, C.D. testified she contacted a Justin Rosales and "disclosed what happened to me and that I had been assaulted." <u>T.T. Vol I N.T. 79</u>

110. Later that day, on April 11th, 2014, C.D. testified "I called my chiropractor, he was able to get me in and <u>I had a rib out of place from the</u>

30

previous night's assault" (emphasis added) <u>Id. at 79</u>

111. After the chiropractor visit, C.D. testified she met with Justin Rosales and Pastor Mike Rhoades and "disclosed everything from the scene he had caused at-- dancing, to the assault in the car..."<u>T.T. Vol I N.T. 80</u> (note that C.D. describes what happened at the swing-dance as "causing a scene" while contrastingly describing the incident within the vehicle as an "assault")

112. Prior to trial, C.D. provided the prosecution with three peices of evidence that C.D. claimed corroborated her allegations: (1) the April 11th, 2014, audio recording (before the jury), (2) text messages sent on April 11th, 2014 (not before the jury) See <u>PCRA Exhibit 51,</u> and (3) C.D.'s chiropractor records (not before the jury). See <u>PCRA Exhibit 30</u>

### i.  Chiropractor Records

113. The chiropractor records are perhaps the strongest evidence regarding this incident because (1) C.D. personally wrote upon the document, (2) the forms were completed within (24) hours of the incident before C.D. had time to fabricate her story, and (3) the explanation for the injuries contained within the chiropractor records is corroborated by other evidence (such as C.D.'s trial testimony, albeit absent the rib injury).

114. At the May 20th PFA hearing, the Petitioner questioned C.D. if she informed Petitioner that she had a chiropractor she utilized after her frequent swing dances and before she met Petitioner. C.D. denied this under oath testifying "I have never popped a rib out of place by swing dancing before." <u>PCRA Exhibit 10 N.T. 22</u>

115. Within the chiropractor records, C.D. wrote "I think my rib is out of place <u>again</u>." (emphasis added)  C.D. also characterized the injury as an "existing injury" rather than the optional "new injury".

116. Within the chiropractor records, C.D., herself, describes the cause of her injuries as "swing dancing last night - pulled arm/shoulder hurt" and "I was swing dancing and my partner whipped me out too hard, injuring shoulder."

117. Within the chiropractor records, C.D. places the date and time of the injury as "4-10-14" at "11:00 p.m." the time of which C.D. and Petitioner were still at the swing dance.

118. To further show that the chiropractor records reveal the true cause of C.D.'s injury, Petitioner presented the testimony of C.D.'s chiropractor, Dr. Barry Morris, at the PCRA evidentiary hearing (Day 4). Dr. Barry Morris personally signed these records and personally treated C.D. on April 11th, 2014.

119. Dr. Barry Morris testified that many of his patients seek treatment for dance related injuries, and that the same type of injury reported by C.D., is the same type of injury reported by his other patients who claim to have received injuries from dancing. PCRA Evi. Hearing Day 4 N.T. 14

120. Dr. Barry Morris further testified that the reported injury was actually a "rib subluxation" (segmental dysfunction or slight misalignment) and not an actual "rib dislocation" (a complete separation). Id. N.T. 14

121. In a single statement made in passing at trial, and likely overlooked by the jury considering the fact that trial counsel presented no defense theory concerning this evidence, C.D. strings together the "yanking" of the arm, the head injury, and the shoulder injury when testifying at trial about the swing dance. However, there is no mention of any rib injury in this testimony as follows:

> "He had me by the wrist, he did not have me by the hand. He was whipping me around like a rag doll and when he put my arm up so I could spin under, he yanked it down real hard so I basically hit myself in the head. He whipped me out really fast and really aggressively and hurt my shoulder" T.T. Vol I N.T. 71 (emphasis added to compare these statements to other evidence detailed below)

122. Here, it is critical that the jury did not have the chiropractor records, the April 11th, 2014 text messages, nor other evidence connecting the arm injury, the head injury, and the shoulder injury to the rib injury. Nor did the jury hear evidence (such as C.D.'s May 20th, 2014 PFA testimony) attributing the arm injury, head injury, and shoulder injury to the alleged assault within her vehicle.

### ii.  April 22nd Rib Dislocation

123. Further evidence that C.D. misrepresented her dance injuries can be found in C.D.'s pretrial statements that she received chiropractor treatment for a second rib injury after being abused by Petitioner on April 22nd, 2014. (See PCRA Exhibit 12, 45 and 46); See also C.W.'s 404(b) Motion at 97(iii). The evidence proves that this April 22nd visit was merely a follow-up visit related to the April 11th, 2014, visit and was not evidence of a new injury.

124. Although C.D. did not testify about the April 22nd, 2014, rib injury at trial, C.D.'s pretrial attempts to use her chiropractor records as false evidence that she was assaulted on April 22nd, 2014, corroborates the fact that she did the same regarding April 11th, 2014.

125. Dr. Morris testified that if a patient reported a new injury, that "new injury" would be indicated upon the daily visit note. PCRA Evi. Hearing Day 4 N.T. 8-9  The April 22nd Daily Visit Note does not indicate "new injury".

126. On the April 22nd Daily Visit Note, at the top, it states "visit #2/4" corresponding to the April 11th "FOR OFFICE USE ONLY" document of PCRA Exhibit 30  which sets the Planned Recommended Treatment Schedule as "(4) visits @ (2) times per week for (2) weeks". Thus, the April 22nd visit was the second of four planned visits scheduled during the April 11th visit.

### iii.  April 11th Audio Recording (Fabricated Evidence)

127. When compared to the evidence detailed herein, contextual clues are revealed in the April 11th, 2014, audio recording that show that this audio was used at trial as fabricated evidence that Petitioner admitted to committing a criminal offense within the vehicle on the car ride home, when in actuality, Petitioner merely admitted to accidentally hurting C.D. while swing dancing, which is not a criminal offense. The audio reveals the following:

    (a) Despite its long duration and Petitioner's intoxicated state, there is absolutely no mention, by C.D. or Petitioner, of C.D. having her head slammed into the car window or a knife being pulled;

    (b) After the Petitioner admitted to hurting C.D., the Petitioner asks "Are you okay? Is your arm okay?" (audio at 00:40)

    (c) Petitioner characterizes the head injury as an "accident" (audio at 1:12)(compare to C.D.'s testimony at the May 20th, 2014 PFA hearing regarding the swing dance: "he cut in violently and hit me in the head, which he said was an accident" N.T. 18) (compare also to the April 11th, 2014, text messages below)

    (d) Conversation about the swing dance immediately follows the Petitioner's apology for hurting C.D. (audio at 2:30 and at 25:04)

    (e) When Petitioner asked C.D. why he would want to hurt C.D., C.D. says because "you were angry" (audio at 1:30), Petitioner denied hurting C.D. because he was angry and then responds by questioning C.D. about not dancing with Petitioner (audio at 1:42)

    (f) There are several references to alcohol being the cause of Petitioner accidentially hurting C.D. and that it "hit" Petitioner while he was dancing (audio at 3:35)

    (h) At trial, C.D. also gave false testimony in an attempt to

mischaracterize the audio by testifying under oath that "as you heard in that audio, he was threatening killing himself, he was threatening killing us both". <u>T.T. Vol I N.T. 101</u>. The audio simply contains no such threats.

128. It is no coincidence that the arm and head are mentioned in this audio and that C.D. testified at trial to receiving a arm and head injury while swing dancing. This is especially so where the entire audio contains conversation about the swing dance.

129. There is also evidence that no assault took place immediately prior to the audio being created as C.D. testified at trial. During the time Petitioner allegedly assaulted C.D., Petitioner had been talking on C.D.'s phone with an Andy Frank, a member from church who was present at the swing dance.

130. During the audio, C.D. stated that Petitioner had her phone (audio at approx. 22:47).

131. Petitioner used C.D.'s phone because Petitioner had no minutes on his phone's plan but only had text messages. Petitioner and Andy Frank exchanged text messages about this phone call, before and after the phone call. Petitioner used his phone to engage in this text messaging. See <u>PCRA Exhibit 16, pages 67-68, text 183, 184, 185, and 186,</u> attached as <u>Appendix "B"</u>

132. The reason C.D. did not record Petitioner earlier is because Petitioner was using C.D.'s cellphone and C.D. recorded Petitioner only after he ended this phonecall and returned the cellphone to C.D.

133. This phonecall took place around 1:48 a.m. and ended before 1:58 a.m. on April 11th, 2014, about the time C.D. began recording Petitioner. (See "device time" within <u>PCRA Exhibit 16</u> for accurate timestamps) The text messages exchanged correspond with this timeframe. (7:20 into the audio, C.D. mentions the current time as 2:05 a.m., indicating that the audio began at 1:58 a.m.)

35

### iv.    April 11th Text Messages Exchanged Between C.D. and Petitioner

134. C.D. offered the April 11th text messages (PCRA Exhibit 51) as incriminating evidence that Petitioner admitted to and discussed the assault within her vehicle, as C.D. did with the April 11th audio. However, when compared to the evidence above, including C.D.'s trial testimony about the swing dance, it is evident that Petitioner was discussing the swing dance within the April 11th text messages.

135. After Petitioner denied "laying a hand" on C.D., C.D. clarified that Petitioner grabbed her "arms/hands" before. (compare to C.D.'s trial testimony at Vol I N.T. 71 where C.D. claims Petitioner grabbed her by the "wrists" while dancing. Also note that C.D.'s use of the slash between "arms" and "hands" suggests a reference to the wrist, anatomically).

136. In the April 11th, 2014, text, Petitioner refers to the incident being discussed as an "accident" consistent with the April 11th audio and C.D.'s May 20th, 2014 testimony about the swing dance at N.T. 18.

137. Petitioner ended the April 11th text conversation with "hope your shoulder feels better." (compare to T.T. Vol N.T. 71 where C.D. testified Petitioner "hurt my shoulder" during the swing dance. Compare also to the chiropractor records).

138. In sum, C.D. used the same language while testifying at trial about the swing dance Vol T.T. N.T. 71, that can be found within evidence C.D. falsely represented to be evidence of an assault after the swing dance. The audio mentions the arm, the head, and refers to the injury as an accident. The text messages refers to an "accident" and the shoulder injury. The chiropractor records refer to the arm injury, the shoulder injury, and the rib injury. In other words, C.D.'s trial testimony attributes the rib injury to an assault after leaving the swing dance and omits the rib injury while testifying about

36

the swing dance, however, the chiropractor records contain the same information

C.D. testified about when testifying about the swing dance but <u>includes</u> the rib

injury, attributing the rib injury, instead, to the swing dance accident.

## II.  April 20th through April 22nd, 2014

139. At trial, C.D. testified that on April 20th, 2014, (1) C.D. spent

Easter with her family <u>T.T. Vol I N.T. 89</u>, (2) Petitioner called C.D. throughout

the day insulting C.D., complaining about C.D. spending Easter with her family,

and demanding that C.D. come to Petitioner's house <u>Id.</u>, and (3) that the first

time C.D. saw Petitioner on April 20th, 2014, was at night and at Petitioner's

house. <u>Id. N.T. 90</u>

### i.  C.D.'s Testimony and Other Evidence Places C.D. and Petitioner
### In Two Places At Once On April 20th, 2014

140. During the PCRA proceedings below, and contrary to C.D.'s trial

testimony given under oath, Petitioner incontrovertibly proved that C.D. was

<u>with</u> Petitioner, at two separate churches, because C.D. and Petitioner were in

the church's worship band and performed for Easter Service from 9 a.m. til 12 p.m.

at Grace Chapel and again from 5 p.m. til 9 p.m. at a sister church called

"The Gathering".

141. Petitioner's presence and participation in publicly conducting

Easter Service with C.D. wholly undermines C.D.'s testimony for several reasons:

(1) it places C.D. and Petitioner in two places at once, (2) it demonstrates that

Petitioner was not making terroristic phone calls to C.D. on this day because

he was physically with C.D., (3) the surrounding details (e.g. that C.D. was

spending Easter with her family) are false, and most importantly, (4) it

undercuts C.D.'s entire testimony that Petitioner raped and beat C.D. for this three-day period because he was angered by C.D.'s celebration of a pagan holiday, Easter, when Petitioner, himself, was celebrating Easter with C.D.

142. At trial, C.D. portrayed Petitioner as a religious psychopath. Id. C.D. testified that Petitioner's motive for allegedly raping and beating C.D. from April 20th-22nd, 2014, was "that he had to punish me for participating in Easter because he was on a holy volition and I needed to be punished for celebrating it." T.T. Vol I N.T. 91

142. Consistent with C.D.'s efforts to frame Petitioner (e.g. April 11th audio and text messages), the only mention of a pagan/Easter correlation within the cellphone extraction report and Facebook records is contained in two messages authored by C.D., herself, and sent to Petitioner at 7:35 a.m. and 10:15 a.m. on the morning of April 20th, 2014. See Appendix "B" (Facebook records pages 552, 553, and 554)(See also C.D.'s admission to sending photographs from this same I.P. address 71.162.21.7 T.T. Vol I N.T. 118, Facebook pages 550-551)

143. Upon cross-examination, trial counsel showed C.D. "Defense Exhibit R" (mislabeled in the trial transcript as exhibit "I". See also T.T. Vol I N.T. 145, lines 4-7), which was a picture recovered from Petitioner's Facebook records depicting C.D. and Petitioner in front of a local church called "The Gathering". T.T. Vol I N.T. 142

144. C.D. testified as to when this picture was taken: "Easter Sunday right before alot of violence happened." Id. However, trial counsel did not question C.D. as to where this picture was taken. (See also Facebook records pages 555-563 PCRA Exhibit 5)

145. Petitioner's PCRA Exhibit 47, are pictures from GOOGLE MAPS of the church located on Elm St., that of which can clearly be seen in the background of Defense trial exhibit "R" (note that the structure and brickwork are identical).

146. The Facebook records also reveal that invitations were sent by members of the church to attend Easter Service at this church located on Elm St.,

Sharon, PA. See PCRA Exhibit 5, pages 377-378

147. Petitioner's cellphone extraction report (PCRA Exhibit 16), page 80, text 333 etc., shows a Pastor Mike Rhoades and Petitioner discussing music equipment arrangements on April 20th, 2014.

148. Contrary to C.D.'s trial testimony, the extraction report of Petitioner's cellphone reveals no phone calls were placed to C.D. on April 20, 2014. See PCRA Exhibit 16   This is because C.D. was with Petitioner throughout this day.

149. Although Petitioner was at church for the majority of April 20th, 2014, for good measure, Petitioner presented the testimony of his Grandmother, Linda Anderson, who lived at Petitioner's house until March of 2014. Ms. Anderson testified that no landline was installed at 1002, Fruit Ave., Farrell, PA, after March of 2014 because she had taken the phone to her new residence in Sharon, PA. PCRA Evi. Hearing Day 5 N.T. 74

150. C.D. claimed to arrive at Petitioner's house at 8 p.m. on April 20th, 2014. See PCRA Exhibit 12 and PCRA Exhibit 45

151. The prosecutor questioned C.D. at trial as follows: "And when you got to his house, did he -- did he continue the fighting that you had been having earlier on the phone?" And C.D. answered "Yes" T.T. Vol I N.T. 90  As detailed above, C.D. was with Petitioner and no phone calls were placed to C.D. on April 20th, 2014.

### III.  April 21st, 2014

152. At trial, when asked "when was the date that you were able to leave?" C.D. falsely testified under oath "Two days later on the 22nd" (i.e. April 22nd)

153. At trial, C.D. falsely testified that she did not have her phone "at any point" because Petitioner "had taken it." T.T. Vol I N.T. 91-92

154. The evidence detailed below proves that C.D. was not even at

39

Petitioner's house (the alleged scene of the crime) for the entirety of April 21st, 2014, as C.D. testified at trial under oath.

155. According to C.D.'s December 2014 handwritten statement (PCRA Exhibit 12), under the April 20th-22nd heading, C.D. wrote "The next morning [i.e., April 21st, 2014]... all day, he kept me locked in his bedroom." and "A whole night and entire day being locked up with him finally set me off."

156. As evidenced by the Facebook records, C.D. sent two Facebook messages to Petitioner from I.P. address 71.126.42.167, the same I.P. address assigned to C.D.'s device on dates C.D. admitted to not being physically at Petitioner's house.

157. PCRA Exhibit 5 (Facebook records), page 564, shows C.D. messaging Petitioner "Leaving now hunni" and "See you soon." on April 21st, 2014, at 8:28 p.m. (after coverting the timestamp from U.T.C. to Standard Eastern Time). C.D. sent these two messages from I.P. address 71.126.42.167. See Appendix "B" On its face, these messages suggest C.D. was not with Petitioner at the time these messages were sent.

158. Moreover, PCRA Exhibit 35, page 5, contains a message authored by C.D. and sent to a Melissa Trollman on April 21st, 2014, at 7:13 p.m., approx. an hour before C.D. sent the Facebook messages above at ¶157.

### i.  I.P. Address 71.126.42.167 Was Assigned to a Physical Address Other Than Petitioner's House At the Relevant Time

159. Had trial counsel not been ineffective, he would have subpoenaed C.D.'s internet service provider for the physical address associated with I.P. address 71.126.42.167. Trial counsel would have learned that I.P. address 71.126.42.167 was assigned to 4059 Longview Rd, West Middlesex, PA (C.D.'s parents' house where C.D. lived at the time).

160. Unfortunately, establishing that 71.126.42.167 was assigned to a physical location other than the alleged scene of the crime is a bit more

complicated but is discernable from the record below.

161. First, an examination of the Facebook records reveal that a timestamp appears above each message sent. If multiple pictures are sent simultaneously, only a single timestamp appears above the series of photographs.

162. Second, an examination of the Facebook records reveal that when a cellphone's data and carrier network are used to connect to the internet to access Facebook.com, no I.P. address is shown in the Facebook timestamp (e.g., page 412). Contrastingly, when a user does not use a cellphone, but rather a computer connected to the internet by an internet provider assigned to a physical address, an I.P. address is identified within the Facebook timestamp. (See page 530 of the Facebook records where C.D. states "I'm home. My phone hasn't turned back on yet.") See Appendix "B"

163. Because C.D. testified to sending messages and pictures to Petitioner on dates she testified she was not physically with Petitioner, and did so from I.P. address 71.126.42.167, this establishes that C.D. was also messaging Petitioner from this same physical location on April 21st, 2014, and thus, was not physically with Petitioner as C.D. testified at trial under oath.

164. The record is clear that C.D.'s allegations take place on April 20th-22nd, April 26th, and April 29th, 2014. Both, the prosecution knew, and C.D. testified in a manner that confirmed that, between these dates (i.e., April 23rd, 25th, and 28th, 2014), C.D. and Petitioner were not "together in the same place." T.T. Vol I N.T. 96

165. C.D. testified that she sent Petitioner photographs on April 25, 2014 at 9:17 a.m. from I.P. address 71.126.42.167. T.T. Vol I N.T. 142 (compare to Facebook record page 730) See Appendix "B"

166. C.D. testified that she sent Petitioner photographs on April 28th, 2014 at 9:35 p.m. from I.P. address 71.126.42.167. Id. N.T. 143-144 (compare to Facebook record page 568). See Appendix "B"

41

167.    Again, C.D. testified that she sent Petitioner photographs on April 28th, 2014, at 9:56 p.m. from I.P. address 71.126.42.167 T.T. Vol I N.T. 135-141 and 151 (compare to Facebook record page 598). See Appendix "B"

168.    Corroborating evidence that C.D. and Petitioner were not together on April 25th, 2014 and April 28th, 2014, can be found in the cellphone extraction report (PCRA Exhibit 16), within the phone log portion attached in Appendix "B". On pages 17-18, there are (15) phonecalls made between C.D. and Petitioner on April 25th, 2014. On pages 16-17, there are (13) phonecalls made between C.D. and Petitioner on April 28th, 2014. Some calls are long in duration.

## IV.    The Commonwealth violated Brady v. Maryland by Withholding Prior Statements Made by Caitlin Dobran

169.    C.D. first alleged to have been thrown down a flight of stairs that led into Petitioner's basement and to have remained there for several hours on April 20th, 2014. See PCRA Exhibit 12 (submitted by C.D. in December of 2014)

170.    At trial, C.D. testified to being locked, at least, partially, within Petitioner's basement on April 21st, 2014. T.T. Vol I N.T. 92 Nevertheless, C.D. alleged to have been held captive within Petitioner's basement.

171.    Prior to trial, C.D. was interviewed by Detective Kirt T. Snyder of the Mercer County District Attorney's Office.

172.    Detective Snyder subsequently investigated the information provided by C.D. by obtaining access to the alleged scene of the crime, the house located at 1002 Fruit Ave., Farrell, PA, that of which was owned by a Michael Lowrey.

173.    Detective Snyder interviewed various witnesses and took pictures of the house located at 1002, Fruit Ave., Farrell, PA.

174.    On June 10th, 2016, atleast six months prior to the trial in this case, Detective Snyder compiled a report of his findings and provided this report in an email addressed to then District Attorney Miles K. Karson.

175. According to the report, when asked why she didn't try to escape from Petitioner's basement, C.D. inaccurately described Petitioner's basement to Det. Snyder by reporting that the basement in question had no windows and no door leading to the backyard for C.D. to escape from.

176. When Det. Snyder investigated this, he found that the basement had several windows <u>and</u> a back door leading outside-- a door which was only accessible from inside the basement.

177. Petitioner also presented the testimony of Investigator, Rich Graham, who also gained access to the 1002 Fruit Ave., house, examined the scene and took several photographs, including photographs of the several windows and basement door. <u>PCRA Evi. Hearing Day 3 N.T. 79</u> and <u>PCRA Exhibit 14</u>

178. The Snyder report also revealed that C.D. informed Det. Snyder that Petitioner had several locks upon his bedroom door that Petitioner used to prevent C.D.'s escape. <u>PCRA Evi. Hearing Day 3 N.T. 53-54</u>  C.D. also testified to this effect. <u>T.T. Vol N.T. 65, 99, and 108</u>

179. According to the Snyder report, Det. Snyder investigated this and found this to be false. Det. Snyder discovered that Petitioner's bedroom had only one lock upon its knob and that this was unlockable from within the bedroom.

180. Tyrell Sipe was the owner of the house at 1002 Fruit Ave., Farrell PA, after Michael Lowrey. Both owner's reported to Rich Graham and Kirt Snyder, respectively, that they did not change the door frame of Petitioner's bedroom nor remove any locks from the door's frame.

181. Petitioner's door frame contained no locks nor impressions upon the wood of the door's frame that would indicate that locks were once installed as C.D. described. <u>PCRA Evi. Hearing Day 2 N.T. 79-80</u> and <u>PCRA Exhibit 14</u>

### i.  The Snyder Report was Supressed by the Commonwealth

182.  Trial counsel testified that he never received the Snyder report during discovery in this case. PCRA Evi. Hearing Day 3 N.T. 52

183.  Petitioner was provided this report during discovery in the sister case at 1513-CR-2016, involving C.D. in September of 2019. The Commonwealth conceded this upon the record in that case. See Feb 13, 2020 Transcript, PCRA Evi. Hearing Day 6 N.T. 41 and Appendix "B"

### ii.  The Snyder Report was Material

184.  The Snyder report was favorable to the accused because it would have impeached a key witness for the Commonwealth. The Snyder report demonstrates that the Commonwealth knew C.D. failed to accurately describe Petitioner's basement where she was allegedly held captive, indicating C.D. did not have knowledge of what this basement looked like, and thus, was never inside Petitioner's basement as C.D. testified to under oath, at Petitioner's trial.

185.  Additionally, this evidence would have prompted competent counsel to focus his investigation and trial preparation upon C.D.'s April 20-22nd allegations. After learning about this report, competent counsel would have (1) examined the Facebook records for any communication that may have occured between Petitioner and C.D. on April 20, 21, and 22nd, (2) investigated and subpoenaed C.D.'s internet provider for the physical address associated with I.P. address 71.126.42.167, (3) would have called Melissa Trollman to the stand to testify about text Ms. Trollman received from C.D. on April 21st, 2014, (See below), and (4) called Kirt Snyder to the stand to testify about his report, all in an attempt to show that C.D.'s trial testimony was false, incredible, and/or was not to be given weight by the jury.

**V.  May 1st**

186.    C.D. gave two irreconcilably different versions of her May 1st, 2014, allegations while testifying under oath at the PFA hearing of May 20th, 2014, (PCRA Exhibit 10) and while testifying under oath at the trial in this case.

187.    At trial, in regards to May 1st, 2014, C.D. testified "I consider this the worst night." T.T. Vol I N.T. 102   See also PCRA Exhibit 12 (characterizing May 1st, 2014, as "the WORST of it all" (emphasis in original))

188.    As with C.D.'s chiropractor records, C.D.'s allegations get worse with time. On May 20th, 2014, only (19) days had passed since May 1st, 2014, and thus, C.D. had less time to fabricate her allegations.

189.    At the May 20th PFA hearing of 2014, C.D. testified under oath that on May 1st, when C.D. first arrived at the Petitioner's house, his demeanor was "calm" N.T. 24 and N.T. 35, that C.D. was suicidal Id., that Petitioner took C.D. upstairs to an "empty room" N.T. 8, knelt before C.D., attempted to comfort C.D. N.T. 25, that C.D. then moved to the floor and tried to grab a television cable that was hanging out of the room's wall Id., tried to wrap this T.V. cable around her own neck Id., that the Petitioner tried to prevent C.D. from doing so Id., that C.D. then went for a carpenter's knife Id., that she gripped the knife hard in her hand Id., that the Petitioner tried to pry the knife from C.D.'s fingers, that C.D. accidentally cut herself when doing so Id. N.T. 26, that Petitioner guided C.D. to the bathroom to wash and bandage the minor cuts Id., that the Petitioner then led C.D. to his downstairs bedroom, that Petitioner didn't want C.D. to leave because he was afraid C.D. might hurt herself Id. N.T. 27, that as C.D. and Petitioner entered this bedroom, it appeared to C.D. that Petitioner was rearranging his furniture Id. N.T. 28, that C.D. agreed to stay and talk to Petitioner N.T. 11-12, and that the abuse didn't allegedly occur or begin until after C.D. and Petitioner entered this downstairs bedroom. N.T. 36

45

190.    Petitioner posed (17) questions that yeilded simple "yes" responses from C.D.. See May 20th, 2014 Transcript pages 24-26    Had these (17) questions not contained the truth of what happened, how could Petitioner have known that these (17) specific questions would have yeilded "yes" responses from C.D.?

191.    At trial, and presumably guided by the May 20th transcript, the prosecutor questioned C.D. "And when you arrived at the house had he calmed down at that point?". T.T. Vol I N.T. 102    Contradicting her May 20th, 2014, testimony, C.D. testified in response that she was immediately met with insults, the typical names, and that Petitioner told C.D. she needed to be punished. Id.

192.    At trial, instead of C.D.'s May 20th testimony that Petitioner attempted to comfort C.D. once in the upstairs room, C.D. testified "He told me I was going to die that day." T.T. Vol I N.T. 103

193.    At trial, instead of C.D.'s May 20th testimony that "I agreed to stay there and talk to Glavin." N.T. 11 and "I said I wanted to leave, but, umm, seeing Glavin's condition, I - and he asked me to stay, so I agreed to stay" Id. N.T. 12, C.D. testified "I tried to run for the door and tried to get out of there." T.T. Vol N.T. 107

194.    At trial, instead of C.D.'s May 20th testimony that she was suicidal and tried to hurt herself while Petitioner tried to prevent her, C.D. testified that Petitioner, himself, tried to strangle C.D. with a wire and that C.D. cut herself when struggling to defend herself against Petitioner.

195.    C.D.'s trial testimony that a physical altercation occurred in the upstairs bedroom is directly contradicted by C.D.'s May 20th testimony that the physical abuse did not begin until C.D. and Petitioner went from the upstairs room to the downstairs bedroom and only after Petitioner allegedly became angry after looking through C.D.'s cellphone. May 20th, 2014, N.T. 36

196.    At trial, C.D. went so far as to even deny that a television cable was involved in the incident, testifying that "There was no cable in the wall

46

ever, they were all laid out on the floor." T.T. Vol I N.T. 149

197.    To show that C.D.'s trial testimony was false, and to help show that the May 20th, 2014, version of May 1st was closer to the truth, at the PCRA proceedings below, Petitioner presented photographs taken by Investigator Rich Graham of the television cable located in the relevant room (Linda Anderson's old bedroom). See PCRA Exhibit 14 and PCRA Evi. Hearing Day 3 N.T. 80-81 Linda Anderson also testified that while living at this house, Ms. Anderson had a cable extension connected to this particular cable recepticle that she used to connect to her T.V.. PCRA Evi. Hearing Day 5, N.T. 68, 69, and 70

198.    C.D. also gave testimony at the May 20th PFA hearing that contradicts her trial testimony. C.D. testified that during C.D. and Petitioner's relationship, Petitioner made C.D. feel "more loved" than anybody else in her entire life. N.T. 29  C.D. also testified that throughout her relationship with Petitioner, that the Petitioner tried to have serious conversations with C.D. about the importance of C.D. feeling comfortable and safe with Petitioner and that these conversations took place "everytime" C.D. told Petitioner that she felt that Petitioner might hurt her. N.T. 28-29

## B.  Caitlin Had A Clear Motive For Testifying Falsely and For Falsely Incriminating Petitioner

199.    The record below demonstrates that C.D. had two motives for testifying falsely and for falsely incriminating Petitioner: (1) C.D. believed Petitioner ruined her reputation amongst her church community by publicly making it known that C.D. and Petitioner were sexually active and by claiming to be innocent of C.D.'s original misdemeanor allegations and (2) C.D. pretentiously proclaimed that she was saving future women from being abused by Petitioner by personally making it her mission to send Petitioner

to prison by any means necessary.

200.    During the time C.D. dated Petitioner, C.D. developed a reputation for having a character for untruthfulness based upon C.D.'s accusations of sexual misconduct against other men who were members of C.D.'s church. See PCRA Exhibit 35

201.    C.D. accused Eric Kurelko (C.D.'s romantic partner before Petitioner), Everett Delgross (C.D.'s romantic partner after Petitioner), and Justin Rosales. The church administration (including various pastors and Melissa Trollman) even had meetings about how to address C.D.'s behavior. These accusations reasonably caused many members of the church to view C.D. in a negative light.

202.    When C.D. began to accuse Petitioner of domestic violence, and after Petitioner publicly claimed to be innocent of those accusations, members of C.D.'s church community began to take Petitioner's side. C.D. viewed this occurence as Petitioner attacking C.D.'s reputation.

203.    C.D. took every opportunity to inform authorities about how Petitioner's actions had a negative impact upon C.D.'s reputation within the church community which evidences how important it was for C.D. to make it appear that Petitioner was guilty of C.D.'s accusations by incriminating Petitioner regarding the allegations of A.C.. By showing Petitioner abused someone else, C.D. sought to bolster her own credibility regarding her own allegations. The statements are listed as follows:

a) "He said he was going to ruin my reputation by telling everyone that I was a whore and I'd done things with him." and "He said he would ruin my life by destroying my reputation."

See PCRA Exhibit 46, pg 1 and 2 (Petitioner is alleged to have said this immediately before C.D. began recording Petitioner on April 11th, 2014, in an attempt to falsely incriminate Petitioner and blackmail Petitioner as detailed above. Also note that "whore" and "done things" contain sexual connotations)

b) "He would ruin my life by telling the church what a whore I was..." and "he could ruin my reputation, ruin my fundraisers for my mission work."

PCRA Exhibit 10 N.T. 19 (May 20th, 2014 testimony)

c) "I Know he contacted my pastor and several of my friends in a mass message saying that I was a liar, that he was the victim, not me, basically trying to ruin my reputation."

PCRA Exhibit 19 N.T. 18 (August 13th, 2014 testimony)

d) C.D. testified that it was "embarassing" that the Petitioner posted a Facebook message stating "She probably lied and said we didn't have sex, but the truth is it only took me [] three weeks." Id. This Facebook post was admitted at the August 13th, 2014, PFA violation hearing as Commonwealth's Exhibit 11 and 13. C.D. wrote upon this exhibit as follows: "On Saturday, August 2, 2014, at 12:16 p.m., Glavin sent out a Facebook message to seven people to try and ruin my reputation." PCRA Exhibit 20

e) "He is also text messaging everyone, like my pastor and friends, saying that I am the one to blame, that I am the liar, and so he's trying to ruin my reputation [], its just the point that he is still-- is exhibiting power over me, over my life, causing other people to look at me differently, and he shouldn't be able to do that."

August 13th, 2014, PFA violation hearing N.T. 21-22

f) C.D. testified that people were "messing with me, like, messing with my head about [Petitioner] and trying to turn things around, that happened on several occasions." C.D. testified that many "people" were "coming at" her about what occurred between C.D. and Petitioner.

PCRA Exhibit 19 N.T. 29-30 (August 13th, 2014, PFA violation hearing)

g) Two days prior to Petitioner's arrest, on November 16th, 2014, C.D. and A.C. were communicating via text message where A.C. says to C.D. "I think you have a lot of people that will help you too.", to of which C.D. replied "What do you mean? He trashed my reputation."

PCRA Exhibit 21


204.    In her Facebook communication with Melissa Trollman, C.D. compared

her rape allegations against Petitioner to the damage to her friendships with

Melissa Trollman and Justin Rosales, both of which were members of C.D.'s

church. C.D. stated, that these two individuals hurt C.D. "worst of all",

more than allegedly being raped and beaten over a two-month period. See

PCRA Exhibit 22 and 35 pg 13

49

**C.  Caitlin Dobran Ultimately Recanted Her Trial Testimony After The Trial In This Case Which Prompted The Commonwealth to Nolle Pross All 49 Charges Against Petitioner In A Separate Case**

205.    In August of 2016, the Commonwealth charged Petitioner with a second case stemming from the numerous allegations of rape made by C.D., those of which C.D. testified about as a 404(b) witness in the trial of the instant case.

206.    This sister case was docketed in the Mercer County Court of Common Pleas at CP-43-0001513-CR-2016.

207.    In March of 2020, the Commonwealth nol-prossed all the charges at 1513-CR-2016 once C.D. recanted her allegations against Petitioner (and thus, C.D.'s trial testimony Petitioner now asserts was false). This fact went uncontested by the Commonwealth during the PCRA proceedings below. See PCRA Exhibit 24 (nolle pross order of March, 2020)

208.    At the trial of the Amanda Carroll case underlying this Habeas petition, Forensic Psychologist Dr. Valliere was used by the Commonwealth to provide general education about delay in disclosure, piecemeal disclosure, and contact with the offender after the assault.

209.    Admitted below as PCRA Exhibit 28, was a "Memorandum" (expert report) emailed by Dr. Valliere to David Wenger (the prosecutor assigned to the sister case at 1513-CR-2016, whom of which was also the prosecutor at the trial underlying this Habaes petition.)

210.    On page 2 of PCRA Exhibit 28, it states "The issues that we discussed [i.e., David Wenger and Dr. Valliere]... I can explain to a jury factors that influence victim's decision-making in regards to the various motivations a victim might have to contact the person who assaulted them, to recant allegations of assault, and to withdraw from cooperation with law

enforcement/prosecution after an initial outcry." (emphasis added)

211.     PCRA Exhibit 28 demonstrates that recantation became an issue in the case at 1513-CR-2016 and that the prosecution secured an expert to mitigate the negative impact a recantation would have on the Commonwealth's case.

212.     This memorandum, in conjunction with the prosecution's sudden nolle-pross of its felony case against Petitioner involving C.D., when viewed in light of the false testimony laid out in this petition, is evidence that C.D. ultimately recanted her trial testimony in this case and such recantation is credible. This email would not exist if C.D. did not, in fact, recant.

## D.  Alternatively, trial counsel was ineffective for failing to object to the Commonwealth's knowing use of false testimony and for failing to effectively cross-examine C.D.

213.     In the alternative, and only if the Court does not reach the Napue claim or finds that the facts herein presented do not rise to the level of a Napue claim, trial counsel should have objected to the Commonwealth's knowing use of C.D.'s false testimony or should have rebutted the testimony by effectively marshalling the above evidence during cross-examination of C.D. (absent the Brady material and recantation evidence that was not available at the time of trial).

214.     Although trial counsel testified that he did not suspect the Commonwealth was putting forth perjured testimony PCRA Evi. Hearing Day 5 N.T. 15, if true, this is only because trial counsel failed to adequately review the evidence. However, contrastingly, trial counsel testified that "the whole objective was to show that [C.D.] was either outright lying or exaggerating..." Id. N.T. 20-21, that "I though she would do anything she could [to] nail Mr. Ivy..." Id., that "My investigation led me to conclude that

she liked drama, she liked to be the center of attention, she liked to perform..."
Id. Day 3 N.T. 86, that "You could see that she was playing to the jury." Id.,
and trial counsel was warned by Melissa Trollman that C.D. intended to comit
perjury at Petitioner's trial.

215.    The only constitutionally effective method for showing that C.D.
was "either outright lying or exaggerating" was to utilize the evidence
concerning the points made in this Petition which would have impeached C.D.'s
credibility. Further, trial counsel should have confronted C.D. with her prior
sexual misconduct allegations that C.D. made against other men from her church
and with evidence that C.D. had an improper motive for falsely incriminating
Petitioner as detailed above.

### E.  Trial Counsel was Ineffective for Failing to Call Defense Witnesses Melissa Trollman, Mike Rhoades, and Andy Frank

216.    Trial counsel should have investigated and called Melissa Trollman,
Mike Rhoades, and Andy Frank, to the stand to testify at Petitioner's trial
to rebut the testimony of C.D..

### i.  Melissa Trollman

217.    From March through May of year 2014, Melissa Trollman was a close
friend of Caitlin Dobran. Melissa Trollman also participated, on a weekly basis,
in the worship band of a church called "The Gathering", with C.D. and Petitioner.

218.    Trial counsel should have called Mrs. Trollman to testify as to the
following:

        a) That on November 20, 2014, that C.D. texted Mrs. Trollman via
           cellular phone that C.D. was going to do "ALL I CAN" to make
           sure Petitioner was convicted at trial;

b) That in late 2016, a few months before Petitioner's trial, that Mrs. Trollman was contacted by a Kelli Moore who resided in Texas and who was a friend of Petitioner's, who of which informed Mrs. Trollman that C.D. attempted to convince Kelli Moore to make false accusations against Petitioner to ensure Petitioner's conviction;

c) That at the relevant time, C.D. had a reputation for untruthfulness within the church community and accused other men who were members of the church of sexual misconduct;

d) That C.D. made allegations against C.D.'s former romantic partners, such as "Billy", that were identical to the allegations C.D. later made against Petitioner such as using the bible to convince C.D. to have sex, claiming to be pushed down on a bed, and claiming to be prevented from leaving the room;

e) That on April 21st, 2014, C.D. sent Mrs. Trollman a text message from C.D.'s cellphone number at 7:13 p.m. and that C.D. later admitted to being the author of that text when speaking with Mrs. Trollman.

## ii.  Mike Rhoades

219.    Mike Rhoades was the Pastor of "The Gathering" who led the worship band that C.D. and Petitioner were members thereof. Trial counsel should have called Mr. Rhoades to testify as to the following:

a) That on April 20th, 2014, both C.D. and Petitioner were present at "Grace Chapel" from about 9:00 a.m. til about noon, and at "The Gathering" from 5:00 p.m. til about 9:00 a.m. and were present for the celebration of the holiday: Easter;

b) That at the relevant time, C.D. had a reputation for having a character of untruthfulness in that C.D. accused other members of the church of sexual misconduct.

## iii.  Andy Frank

220.    Andy Frank was also a member of the church's worship band at "The Gathering". Trial counsel should have called Andy Frank to testify that on April 11th, 2014, at approx. 1:48 a.m., the time during which C.D. testified at trial that she was being assaulted by Petitioner, that Andy Frank was speaking

to Petitioner via cellphone.

## F. Trial Counsel's Conduct In This Regard Amounted to Incompetence

221.    Trial counsel opted not to pose a single question to C.D. about C.D. being raped or beaten by Petitioner. Trial counsel's conduct was so unreasonable that no competent lawyer would have followed it and counsel made errors so serious that counsel was not functioning as the "counsel" guarenteed by the Sixth Amendment. Counsel's conduct did not reflect a tactical choice and counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker.

222.    Trial counsel utilized text messages exchanged between C.D. and Petitioner on May 6th, May 7th, and May 8th of 2014, <u>after</u> the latest allegations of criminal activity (i.e., May 5th, 2014). Trial counsel also showed the jury positive Facebook.com photographs that C.D. and Petitioner took together. These photographs danced around the dates C.D. alleged to be abused and completely avoided the substance of C.D.'s allegations.

223.    Trial counsel testified that his chosen strategy was to portray C.D. and Petitioner's relationship in a favorable light <u>PCRA Evi. Hearing Day 1 N.T. 64</u> and "I was trying to distract the jury." <u>Id. Day 1 N.T. 70</u>

224.    Trial counsel testified that his reason for failing to cross-examine C.D. about being raped and beaten, whatsoever, was "because I didn't want to give her a chance to repeat what she already said." <u>Id. Day 1 N.T. 64</u> According to trial counsel, it was better to let C.D. say whatever she wanted uncontested than to examine C.D. about her countless contradictions and evidence showing she was testifying falsely. <u>Id.</u>

225.    This course of conduct was the weaker path in light of the overwhelming evidence available to trial counsel and no competent lawyer would

have chose to paint a positive picture as a stand-a-lone line of defense as opposed to specifically testing the veracity of C.D.'s allegations with her numerous in-court and out-of-court contradictions, evidence of improper motive, and evidence that rendered C.D.'s testimony impossible and/or incredible.

226.    The record is abundant with evidence that trial counsel failed to conduct a thorough investigation and failed to adequately review the evidence in preparation for trial. For example, despite the evidence detailed above, trial counsel testified that he didn't have "any real concrete evidence" to challenge C.D.'s testimony. PCRA Evi. Hearing Day 3 N.T. 89

227.    Trial counsel testified that he did not use C.D.'s chiropractor records because he thought they "corroborated" C.D.'s testimony. Id. Day 2 N.T. 41 Had trial counsel adequately reviewed the record and evidence, he would not have such an opinion. Upon cross, trial counsel admitted that the chiropractor records provided a different explanation as to how C.D. sustained the rib injury. Id. Day 5 N.T. 18 (this different explanation was corroborated by C.D.'s May 20th, 2014 testimony and other evidence)

228.    Trial counsel also speculated that C.D. may have been attempting to protect Petitioner by telling her chiropractor that she sustained the injury dancing. Id. This perception fails to consider the totality of the evidence that renders this speculation not plausible. See Supporting Brief Nonetheless, competent advocacy required that trial counsel marshal the evidence and put the question to the jury to evaluate, which counsel did not do.

229.    Trial counsel testified he had "no basis" for not using the cellphone extraction report Id. Day 2 N.T. 60, "no basis" for failing to marshal the April 20th "two places at once" evidence Id. Day 3 N.T. 40, "no basis" for failing to subpoena C.D.'s internet provider Id. Day 3 N.T. 52, "no basis" for not marshaling the April 21st I.P. address evidence Id. Day 3 N.T. 51, and that trial counsel was not even knowledgeable about computers and did not know

what an I.P. address was despite the Commonwealth defining the term within their Application for Access to Electronic Communications. Id. Day 3 N.T. 26

230.    Regarding C.D.'s May 1st, 2014 allegations, trial counsel testified he had "no basis" for failing to more thoroughly confront C.D. about her May 20th, PFA testimony which contradicted her trial testimony. Id. Day 3 N.T. 64, 65, 66, 67, 68, and 71  Trial should have (1) elaborated upon the disparities between these two versions of testimony, (2) used the May 20th transcript to rebut the Commonwealth's representation that C.D. gave inconsistent testimony because she was under duress at the May 20th hearing due to Petitioner representing himself by highlighting the fact that the majority of C.D.'s contradictory testimony was elicited from her own lawyer before Petitioner crossed, (3) alerted the jury that the prior testimony was given under oath, and (4) moved to admit the transcript of May 20th as substantive evidence.

231.    Trial counsel testified he was not aware of any improper motive or bias C.D. may have had to testify against Petitioner. Id. Day 3 N.T. 90  Trial counsel testified that his reasons for not reviewing or using C.D.'s August 13th, 2014 testimony (which contained evidence of improper motive) was because "Who cares what she said on that date." Id. Day 3 N.T. 84

232.    Trial counsel testified that he did not interview and call any church witnesses to testify about C.D.'s sexual allegations against other men in the church because he believed such testimony would be barred by the Rape Sheild Law. Id. Day 3 N.T. 119-120  This is based upon a misunderstanding of the Rape Sheild Law. See Supporting Brief  However, trial counsel acknowledged that such evidence "could impeach [C.D.'s] credibility. And it's certainly evidence that I would want to bring out; yes." Id. Day 4 N.T. 78

233.    Trial counsel also acknowledged that it would be important for Mrs. Trollman to testify about text messages she received from C.D. while C.D. claimed to be separated from her phone and held captive by Petitioner. Id. Day 4

N.T. 79

## G. Petitioner Was Prejudiced By Counsel's Conduct

234.    Counsel's errors were so serious as to deprive Petitioner a fair trial, whose result is unreliable. Counsel's conduct rendered the proceedings fundamentally unfair. The Petitioner was greatly prejudiced by trial counsel's failure to object to the Commonwealth's knowing use of false testimony and for failing to utilize the evidence to impeach the testimony of C.D.. The Prosecution's case against Petitioner relied upon the improper character inferences suggested by C.D.'s testimony and C.D.'s testimony went virtually unchallenged.

235.    C.D.'s testimony was the most damaging and devastating testimony given at this trial, far more damaging than the of the complainant, A.C.. Had trial counsel effectively crossed C.D., there is a reasonable probability that C.D.'s testimony would have been disbelieved or given much less weight by the jury, leaving room for reasonable doubt. This is especially so given that A.C.'s testimony did little to establish the elements of Rape, unlike the testimony of C.D. who testified directly and at length, to the horrendous and inhumane acts allegedly commited by Petitioner.

236.    The credibility of the persons involved was of paramount importance at this trial as both C.D. and A.C.'s testimony lacked corroboration, and the jury was duped into believing that there was no impeachment evidence available to challenge the credibility of C.D.. The prosecutor capitalized upon trial counsel's failure to impeach C.D. during closing argument as follows:

   a) "This case is about the credibility of the witnesses. The credibility The credibility of the Commonwealth's witnesses that we presented, and the credibility of the tape that you heard of Mr. Ivy." <u>T.T. Last Day N.T. 77</u>;

   b) "At no time during her testimony was the defense able to impeach her about anything. And, believe me, if they could, they would have. Which means to say that she was consistent each and everytime she has told

57

es

her story." Id. N.T. 83

c) "At no point during this trial did they offer any impeachment evidence or any type of evidence that had any basis in fact" Id. N.T. 91-92

d) "There was no impeachment evidence that they could use to show that any version of any testimony was inconsistent with any other testimony. The Commonwealth's testimony was consistent from start to end." Id. N.T. 92

e) "There is not one single version of their story that is corroborated by any piece of evidence except the areas in which they agree." Id. N.T. 92

f) "And they have offered no evidence that is inconsistent with the story of the Commonwealth's case." Id. N.T. 94

237.    Had trial counsel utilized the evidence herein presented, it would have over-powered any rehabilitative testimony C.D. might have given, upon cross or redirect. The impact of this evidence was powerful and would have raised a reasonable doubt as to Petitioner's guilt or would otherwise be difficult for the jury to disregard in weighing the evidence.

238.    Despite the evidence that C.D. had an improper motive to testify, trial counsel failed to provide the jury with any credible explanation as to why C.D. would be testifying falsely. Trial counsel instead argued to the jury in closing "Why did she make the claims? That's for you to decide." T.T. Last Day N.T. 65

239.    The over (30) contradictions and inconsistent statements made to police and other officials show that C.D. has no problem lying and manipulating the courts to vindicate her personal vendetas.

GROUND III

240.    Petitioner was deprived due process of law, the right to a fair trial, and the right to effective assistance of counsel where the Prosecution knowingly used the false testimony of Amanda Carroll

58

and where trial counsel failed to object to said false testimony
and where trial counsel failed to effectively cross-examine
Amanda Carroll at trial in violation of the U.S. Constitution and
its laws.

241.    Prior to Petitioner's arrest, A.C. and Petitioner playfully
mocked C.D. and her misdemeanor allegations by taking pictures of Petitioner
playfully choking A.C. and by publishing ridiculous comments on Facebook.com.
See PCRA Exhibit 5, page 4 and Appendix "C", timestamped 11-9-2014 (expressing
humor in the fact that C.D. alleged that Petitioner propped a keyboard under
the door knob from inside the bedroom to prevent C.D.'s escape. Propping a door
in such a manner would only be effective from the outside, otherwise the
captive could simply remove the prop to escape).

242.    The Facebook records that the prosecution sought, obtained, and
provided to trial counsel during discovery, particularly pages 167-169,
incontrovertibly depict the Petitioner playfully choking A.C.. The date that
A.C. sent this photograph to Petitioner is 11-9-2014, nine days prior to the
alleged crimes. See Appendix "C"

243.    A.C. is visibly laughing within the photograph and A.C. took
this picture as both of Petitioner's hands are within the photograph. Both
A.C. and Petitioner are looking into the camera indicating that A.C. and
Petitioner intentionally posed for the photograph.

244.    Upon Petitioner's arrest, when being interrogated by Det. Wiscott
(the audio of which was played for the jury), Petitioner alluded to the fact
that Petitioner engaged in playful choking with A.C..

245.    Upon redirect, when questioning A.C. about what may have occurred
during visits to Petitioner's house prior to the alleged crimes, the prosecutor
asked A.C. "Did he ever choke you out for fun?" and A.C. responded falsely,

under oath, "No". <u>T.T. Vol II N.T. 99</u>

246.    During the prosecution's closing, the prosecution capitalized upon this false testimony by arguing that Petitioner's statement to police was a dishonest attempt to explain the brusing on A.C.'s neck, was incredible, and was contradicted by A.C.'s testimony which bolstered the credibility of A.C. while damaging the credibility of Petitioner's statement to police, both of which were ultimate issues in this case. <u>T.T. Last Day N.T. 69 and 89</u>  This is so despite the fact that Petitioner's statement to police was truthful and A.C.'s testimony was not.

## A.  Trial Counsel was Ineffective for Failing to Effectively Cross-Examine Amanda Carroll

247.    At trial, counsel was ineffective for failing to confront A.C. about (1) evidence that A.C. never made allegations of rape against Petitioner, (2) the timeline of events during the night of the alleged crimes, and (3) about A.C.'s testimony that she felt like she had no choice but to consent to sexual intercourse which was unreasonable under the circumstances.

### i.  Evidence that A.C. Never Alleged to Have Been Raped By Petitioner

248.    Officer Mark Hynes, who was the first to interview A.C., characterized A.C.'s allegations as an "assault report". See <u>PCRA Exhibit 27</u> (Main Narrative), <u>Appendix "C"</u>, and <u>T.T. Vol I N.T. 47</u> ("I was notified that there was a woman at the police station that wanted to make a report of an assault.")

249.    On November 19th, 2014, A.C. submitted a five-page written report

about the alleged assault. Within this written statement, A.C. makes no mention of sexual misconduct nor does A.C. state that she felt compelled to consent to the sexual encounter. See PCRA Exhibit 25 and Appendix "C"

250.    Shortly after the Petitioner's arrest, A.C. engaged in Facebook communication with Mariah Diraimondo where A.C. expresses guilt about Petitioner's arrest stating "if I could go back and change it, I would." When discussing what had happened, A.C. omits any claim of sexual misconduct and relates details suggesting a domestic assault. See PCRA Exhibit 26 and Appendix "C"

251.    At trial, A.C.'s mother, Deloris Carroll, testified that she and A.C. had a "very open relationship" T.T. Vol I N.T. 40  A.C. testified that she discussed the alleged criminal episode with her mother before going to the police station. A.C. testified that she told her mother that "I think we have a hitter..." T.T. Vol II N.T. 42. A.C. did not testify that she told her family she was raped.

252.    When making her report to Mark Hynes, A.C. informed him that she wanted to continue her relationship with Petitioner and planned to return to Petitioner's house the upcoming weekend (even after the alleged crimes). See PCRA Exhibit 27 and Appendix "C"

253.    No one at this trial, not even the prosecutor, asked A.C. if she was raped and A.C.'s trial testimony is void of any direct statement that she was raped by Petitioner.

254.    Trial counsel testified that he did not believe A.C. "ever did use the term 'rape' to anybody." PCRA Evi. Hearing Day 3 N.T. 146

255.    Petitioner asserts that the evidence points to the fact that (1) A.C. reported a domestic assault (misdemeanor), (2) that Det. Wiscott immediately took over the case and characterized the case as a "rape and kidnapping" case, (3) that investigating police enlisted 404(b) witness Caitlin Dobran to falsely allege rape against Petitioner consistent with the police

attempts to morph A.C.'s allegations into a rape case, (4) that during witness preparation, A.C. clarified to A.D.A. David Wenger that she was not raped by Petitioner, and (5) the prosecution team convinced A.C. that she was "legally" raped.

256.    In response to trial counsel's argument that A.C. was out for revenge (and that this was her motive for testifying), A.D.A. David Wenger accidentally argued to the jury in its closing that: if A.C. were a "spurned lover", then why would A.C. admit she wasn't raped, which would be favorable to the defense. The argument was as follows:

> "A spurned lover is the reason we just heard 45 minutes of closing argument from defense counsel, and they offered no reason, zero reason as to why she changed her story from-- or why the story changed from it was rape to it wasn't." T.T. Last Day N.T. 83

257.    In a written letter sent from Kelli Moore to Petitioner at the Mercer County Jail, Kelli Moore relates that she personally spoke with Amanda Carroll and that A.C. communicated to Kelli Moore that she was not raped by Petitioner and that A.C. didn't know why the police report said that part. See Initial PCRA filings on 2-12-2020 and 3-12-2020 at Docket 1780-CR-2014 and Appendix "C" A.D.A. David Wenger (the prosecuting attorney) stated upon the record "Because I will agree with you, Caitlin and Amanda talked to Kell[i]." See June 30th, 2017 post-sentence evidentiary hearing N.T. 51 (where Petitioner testified about this letter and about the fact that Det. Wiscott threatened Kelli Moore with jailtime if she continued to help Petitioner)

### ii.  The Timeline of Events were Critical to the Elements of The Crimes Charged And to the Jury's Verdict of Guilt

258.    The four-hour lapse of time between the allegations of assaultive behavior and the sexual encounter were critical to the elements of rape and the

jury's verdict because (1) no testimony was heard as to what occurred during this four-hour gap of time, (2) the overall atmosphere changed during this time, and (3) the jury was misled to believe the assaultive behavior immediately preceded the sexual encounter.

259.    A.C. arrived at Petitioner's house at 6:42 p.m. on November 18, 2014. T.T. Vol II N.T. 35, (15) or (20) minutes lapsed from A.C.'s arrival until the first assault (back-hand slap). Id. N.T. 52, the sexual encounter occurred at 11:00 p.m. Id. N.T. 76, and the alleged choking (the last of the alleged assaults) occurred before 9 p.m. Id. N.T. 97-98

260.    According to both, A.C.'s five-page handwritten police report (not before the jury) and A.C.'s trial testimony Id. N.T. 52, the three alleged assaults occurred immediately after one another.

261.    Because A.C. testified that the first strike occurred at approx. 7 p.m. Id., and because the next two assaults occur in immediate succession, a fair and generous review of the evidence demonstrates no assaultive behavior is alleged to have occurred after 7:10 p.m..

262.    A.C. testified that after the alleged choking (the last of the three assaults) that Petitioner became apologetic T.T. Vol II N.T. 55, things calmed down after the last assault Id. N.T. 56, and there was laughing and joking. Id.

263.    A.C.'s testimony simply does not consume a four hour period of time. The record reflects that the prosecution's strategy in obtaining Petitioner's conviction included blurring the line between the misdemeanor assaults and the sexual encounter.

264.    The prosecutor's opening statement is as follows: "She was slapped, smacked over the nose, she was strangled, and she had her hair pulled. After the rape occurs and the defendant was done, he was much calmer." T.T. Vol I N.T. 24 The prosecutor omits the period of time between the assaults and the sexual

encounter and infers that things calmed down only after the sexual encounter.

265.    A.C. was led by the prosecutor into testifying about the sexual encounter immediately after testifying about the assault. T.T. Vol I N.T. 56. And although A.C. testified that things calmed down after the assault Id., the prosecutor pursued a line of questioning that inferred that things calmed down only after the sexual encounter, not before: "And since he raped you, everything was calm, correct?". A.C. responded "Yeah, afterwards, yeah." T.T. Vol II N.T. 58

### iii.  A.C.'s Testimony That She Felt Like She Had No Choice but to Consent to Sexual Intercourse Was Unreasonable Under the Circumstances

266.    Rape by Threat of Forcible Compulsion requires an objective showing that threats of force were employed to "prevent resistance by a person of reasonable resolution."

267.    The trial record is void of any threat of force, expressed or implied by Petitioner, that would deter a "person of reasonable resolution" from resisting to engage in sexual intercourse. The complainant simply had no reason to believe that had she declined to engage in sexual intercourse, that Petitioner intended to use force.

268.    The alleged acts of domestic violence and the sexual encounter were separated by a four-hour lapse of time, during which Petitioner is alleged to have become calm, apologetic, and the overall atmosphere changed.

269.    A.C. testified that she consented because she "felt that I had no other choice, that if I would have, he could have taken it from me forcefully." T.T. Vol II N.T. 56 and 99 (note that stating someone "could have" done something is not the same as stating that they did something. Further note, that this belief was not induced by the Petitioner as reflected in the trial transcript)

270.    A.C. testified that Petitioner and A.C. joked and laughed prior to the sexual encounter and that "I guess it was to keep it from getting serious again, I guess it's kind of my personality to joke about it so it didn't get back to a point where I would be afraid for my life." T.T. Vol II N.T. 76 This testimony establishes that (1) the overall atmosphere was not "serious" immediately prior to the sexual encounter and (2) A.C. was no longer afraid for her life. Moreover, the record demonstrates that A.C. claimed to be in fear for her life only during the domestic assault earlier in the night.

271.    During the sexual encounter, A.C. testified "I guess I was kind of scared he was going to do something, I'm not sure what." T.T. Vol II N.T. 98 The reason A.C. didn't know what Petitioner might do is because Petitioner did not express or imply that A.C. was in danger of being raped.

272.    Trial counsel should have explored these points in cross-examination and should have expounded upon the question of why A.C. assumed Petitioner would rape her if Petitioner failed to communicate that he intended to do so and if Petitioner ceased any assaultive behavior for a four-hour period of time leading up to the sexual encounter.

## B. Trial Counsel's Failure to Object to A.C.'s False Testimony and Failure to Effectively Cross-examine A.C. Amounted to Incompetence

273.    Counsel's conduct was so unreasonable that no competent lawyer would have followed it and counsel made errors so serious that counsel was not functioning as the "counsel" guarenteed by the Sixth Amendment. Counsel's conduct did not reflect a tactical choice and counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker.

274.    Evidence that A.C. testified falsely was provided to trial counsel in discovery in the form of Facebook.com records. However, trial counsel

testified "I don't recall seeing this picture." (i.e., the photograph of Petitioner playfully choking A.C.) PCRA Evi. Hearing Day 3 N.T. 131 This reflects trial counsel's failure to review the evidence in this case.(See also trial counsel's testimony that he wasn't aware there was any evidence that A.C. and Petitioner mocked C.D.'s allegations Id. N.T. 128)

275.    Trial counsel testified he had "no basis" for failing to object to A.C.'s false testimony. Id. N.T. 133 and 136

276.    Regarding the cross-examination of A.C., trial counsel testified that his chosen strategy relied on the fact that "there was never any testimony directly by [A.C.] that she was raped." Id. N.T. 148 However, trial counsel failed to directly question A.C. if she perceived herself as having been raped or ever had doubts that she was raped despite the Commonwealth's theory of the case. Moreover, trial counsel failed to marshal evidence, outside of A.C.'s testimony, that A.C. never reported to police or her family that she was raped by Petitioner despite the fact that trial counsel knew, prior to trial, that A.C. never used the term rape to anybody. Id. N.T. 146 Trial counsel failed to question A.C. about her unreasonable belief that she was in danger of being raped and the fact that this belief was omited from her five-page report to police. Nor did trial counsel ever attempt to argue these facts to the jury.

277.    Trial counsel testified that his chosen strategy was also "to show it wasn't a threat of forcible compulsion that caused her to engage in intercourse" by relying on the facts that (1) A.C. admitted there was intercourse, (2) admitted she was on top during the intercourse, and (3) admitted that she undressed for the intercourse. Id. N.T. 148-149  It takes no expert in the law to realize that none of these facts have any bearing on whether A.C. was threatened with forcible compulsion.

278.    Trial counsel also testified his chosen strategy included a showing that A.C. was a "spurned lover". Id. N.T. 146 However, there was no

66

evidence to corroborate this notion, which the prosecutor highlighted in closing. The stronger and only constitutionally effective strategy was to show that A.C. did not accuse Petitioner of rape in the first place. This course not pursued was in fact corroborated by a wealth of other evidence.

279.    Trial counsel's failures also reflect his lack of understanding of the facts of the case. Trial counsel testified that he believed "several minutes" lapsed between the choking, the domestic assault, and the sexual encounter. Id. N.T. 152  This was a belief likely shared by the jury given the efforts of the prosecutor which required effective cross-examination to rebut.

280.    Trial counsel also testified "I wasn't aware there was a four-hour gap necessarily." Id. N.T. 162

281.    A.C.'s reasons for verbally consenting to the sexual encounter and the exact sequence of events which explained the overall atmosphere during the time A.C. gave her consent, was of paramount importance to Petitioner's defense and no competent lawyer would have abandoned these factual issues especially when they tended to prove a lack of forcible compulsion or threat of forcible compulsion.

## C.  Petitioner Was Prejudiced By Trial Counsel's Conduct In This Regard

282.    Trial counsel's errors were so serious as to deprive Petitioner a fair trial, whose result is unreliable. Trial counsel's conduct rendered the proceedings fundamentally unfair.

289.    The evidence underlying this claim was favorable to Petitioner and corroborated Petitioner's plea of not guilty. Trial counsel failed to test the Commonwealth's case by not questioning A.C. about this evidence.

290.    One can not seriously disregard the value of evidence not used by trial counsel that established that (1) after allegedly being raped and beaten,

A.C. told police she had plans to return to Petitioner's house, and (2) when A.C. communicated with Mariah Diraimondo, A.C.'s family, and police, A.C. failed to report that she was raped or that she only consented out of fear.

291.    Petitioner was prejudiced by trial counsel's failure to isolate and define the exact sequence of events. While the record provides a timeline, this timeline was sprinkled throughout the record and its significance was likely lost upon the jury. Even trial counsel was duped into believing the domestic assaults occurred immediately before the sexual encounter, leaving no time for the emotions of A.C. and Petitioner and the overall atmosphere to change. In other words, by allowing the jury to infer that the domestic assaults and the sexual enounter were part of a the same transaction or chain of events, the jury was permitted to find rape by forcible compulsion.

292.    Furthermore, had trial counsel emphasized the four hours unaccounted for by A.C.'s testimony, it would have corroborated the testimony of Mariah Diraimondo who testified that she arrived home at 9:30 p.m. and while coming up the stairs she "heard them laughing and talking, I heard guitar a few times." T.T. Vol II N.T. 128-129

293.    As to trial counsel's failure to object to the false testimony, Petitioner incorporates by reference ¶246 of this petition.

GROUND IV

294.    Petitioner was denied the effective assistance of counsel where trial counsel failed to effectively cross-examine the Commonwealth's expert, Dr. Eric Vey, where trial counsel failed to investigate and call an expert on behalf of the defense to challenge the Commonwealth's medical evidence, and where trial counsel represented to the jury that the bruising on A.C.'s neck were  caused by the lifting of

<u>cardboard boxes or from hot plastic which was inconsistent with</u>

<u>the explanation provided by Petitioner</u>

295.    On the day after the alleged crimes, on November 19th, 2014, photographs were taken of minor bruising located around A.C.'s collar bone.

296.    During a recorded police interview that occurred upon Petitioner's arrest on November 20th, 2014, that of which was played for the jury at trial, Petitioner informed police that the bruises were "hickies". See <u>Transcript of this audio at the Motion in Limine Hearing of July 6th, 2015 N.T. 35, 36, 37, 39, 58, and 60</u>

297.    A.C. testified that she showed Petitioner's roommate, Jason Wright, hickies upon her neck given to her by Petitioner and that this occurred on the prior weekend. <u>T.T. Vol II N.T. 64, 78, and 79</u>

298.    At Petitioner's trial and in support of its theory of the case, the Commonwealth presented the testimony of expert Forensic Pathologist, Dr. Eric Vey.

299.    Dr. Vey's testimony was used by the Commonwealth in an attempt to establish that (1) the photographed marks on the complainant's collar bone were strangulation marks caused by Petitioner's hand, and (2) that strangulation can result in serious bodily injury, fulfilling the "substantial step" taken towards serious bodily injury (hereinafter "SBI"), an element of Attempted-Aggravated Assault. <u>T.T. Last Day N.T. 95</u>

300.    The Commonwealth also argued that the strangulation event was related to the charge of rape by forcible compulsion and kidnapping. The question of whether or not A.C. was strangled by Petitioner also bore on the issue of credibility, that of both the complainant and Petitioner. <u>T.T. Last Day N.T. 76, 77, and 94, respectively</u>

301.    Ultimately, Dr. Vey's testimony was conclusory, failed to

establish causation, and bore significant weaknesses that effective counsel would have exposed.

302.    During the PCRA proceedings below, Petitioner presented the testimony of Dr. Kevin Whaley of ForensicDX, located at 208 Pomroys Drive, Windber PA, 15963, to show the errors of trial counsel and to show how Petitioner was prejudiced by those errors.

303.    At the PCRA evidentiary hearing, Dr. Whaley testified that he was and is willing to testify at Petitioner's trial. Dr. Whaley reviewed the same materials that Dr. Vey reviewed. PCRA Evi. Hearing Day 4 N.T. 22-23    Below, the Commonwealth presented no rebuttal evidence challenging Dr. Whaley's testimony.


## A.  The Issue of Causation


304.    At trial, Dr. Vey testified that he arrived at the conclusion that A.C. was strangled by Petitioner based upon A.C.'s reports that she had trouble breathing and speaking after being choked. T.T. Vol II N.T. 117  Dr. Vey did not testify that his conclusion was based upon his scientific interpretation of the photographed bruising. It takes no expert testimony to expect that a person who claims to have been choked would report difficulty breathing and speaking and Dr. Vey's testimony amounted to no more than his opinion as to how the case should be decided.

305.    Dr. Vey never testified, and trial counsel never crossed Dr. Vey, as to how Dr. Vey was able to discern that the marks were caused by Petitioner's hand as opposed to some other method, such as by mouth.

306.    Although Dr. Vey testified about the size and location of the marks, neither established causation. No testimony explained how the size of the marks demonstrated they were caused by a hand. T.T. Vol II N.T. 117-120

307.    Although Dr. Vey testified that the location of the marks were

"characteristic of manual strangulation Id., this testimony was incomplete and misleading because the anterolateral location of the marks are not exclusive to manual strangulation cases and do not eliminate other possibilities as to causation (e.g., hickies can be made upon the anterolateral portion of the neck. See PCRA Evi. Hearing Day 4 N.T. 32-33)

308.    The portion of the neck that is referred to as "anterolateral" covers more area than that typically seen in strangulation cases. Even the prosecutor acknowledged, in his closing, that the marks were not in the "right spot". T.T. Last Day N.T. 95

309.    Contrastingly, Dr. Whaley testified that the bruises would be expected to appear higher up the neck because, in order to lift someone up by their neck (as A.C. testified to, T.T. Vol II N.T. 53), the hand of the assailant would have to catch up under the mandible. PCRA Evi. Hearing Day 4 N.T. 33  The marks on A.C. were near the collar bone, not the jawline.

310.    Dr. Whaley further testified that a Forensic Pathologist would not rely solely on the anterolateral location of the injuries to determine causation but rather, would consider a "constellation of findings". PCRA Evi. Hearing Day N.T. 32

311.    Dr. Whaley's ultimate conclusion as to causation was that the pattern of the marks were not consistent with manual pressure to the neck but rather, was consistent with the tissues being pulled. Id. N.T. 24  Dr. Whaley's expert opinion was that the marks were hickies caused by suction of the mouth.

312.    Dr. Whaley testified that he was able to discern this, in part, from the fact that only the capillaries themselves were damaged, causing spotty hemorrhages. Id. N.T. 25  If the injuries were caused by fingertips, the hemorrhages would cover a greater area of the tissues and would not appear blotchy. Id. N.T. 26

71

### i.  The "Usual Signs" of Manual Strangulation Were Not Present

313.    At trial, Dr. Vey testified that "there can be characteristic injuries" that are produced as a result of manual strangulation. These injuries take the form of fingernail abrasions, fingertip contusions, and bruises caused by the palm. However, Dr. Vey did not testify at trial, that he observed these usual signs within the photographs of A.C.

314.    In line with Dr. Vey's obviation of this science, Dr. Whaley testified that  linear marks from the finger's bone, fingernail abrasions, palm marks, repositioning marks, and fingertip contusions were not present in the photographs of A.C. PCRA Evi. Hearing Day 4 N.T. 24, 25, 26, 27, 28, 42 and 43

### ii.  Petechial Hemorrhages- A Usual Sign Also Not Present

315.    In Dr. Vey's written report, admitted at trial as Commonwealth's Exhibit 14, Dr. Vey described what petechial hemorrhages are, as follows:

> "If the amount of pressure is sufficient in severity to occlude only the jugular veins, then arterial blood flow into the head will continue while venous return from the head will be obstructed. As such, intense venous congestion of the head and face will occur and rupture of the small blood vessels due to increased pressure within the fragile post-capillary venules occur, leading to characteristic pinpoint petechial hemorrhages."

316.    Dr. Vey stated, on page 2 of his written report that "No petechial hemorrhages are evident in the photographs of the victim."

317.    Alarmingly, Dr. Vey gave no testimony about petechial hemorrhages at Petitioner's criminal trial and trial counsel failed to cross Dr. Vey about these "characteristic" petechial hemorrhages.

318.    Dr. Whaley testified that blood deposits in the eyes and eyelids as a result of blood entering the head but being unable to exit due to occlusion

of the jugular veins. PCRA Evi. Hearing N.T. 25 Dr. Whaley testified no petechial hemorrhages are present in the photographs of A.C. Id.

319.  Dr. Whaley testified that petechial hemorrhages are seen in the majority of cases; in upwards of 90% of manual strangulation cases. Id. N.T. 27

### iii. Evidence Adduced at Trial Proved That There Was No Occlusion of the Blood Flow

320.  At trial, Dr. Vey defined strangulation as "a type of death where there is interruption of the blood flow to the brain secondary to forceful compression of the neck." T.T. Vol II N.T. 118

321.  In Dr. Vey's written opinion he stated that 4.4 pounds of pressure or more occludes the jugular veins and 11 pounds of pressure or more occludes both the jugular veins and the carotid arteries. See Commonwealth's Trial Ex. 14

322.  At trial, Dr. Vey testified that "If pressure is applied to the neck sufficient to completely block the blood flow from the brain or to and from the brain together, if sufficient pressure is applied to completely interrupt the blood flow consciousness will be lost in 10 to 15 seconds." T.T. Vol II N.T. 122

323.  A.C. described the force applied to her neck as "an extreme amount of pressure". T.T. Vol II N.T. 53 A.C. testified to being choked for 30 seconds but did not lose consciousness. Id. N.T. 104

324.  At trial, the prosecutor acknowledged the conflict between Dr. Vey's testimony that a loss of consciousness will occur in 10 to 15 seconds after pressure is applied to the neck, and A.C.'s testimony that she was choked for 30 seconds but did not lose consciousness. In an attempt to resolve this conflict the prosecutor examined Dr. Vey as follows:

"Q. And is it possible that somebody could be grabbed around the neck in the way that it appears in the photos and not lose consciousness?

A.  Certainly. If the pressure applied is not sufficient to completely block the blood vessels but rather incompletely block the blood vessels, the delay until unconscious[ness] supervenes is going to be a little bit longer." <u>T.T. Vol II N.T. 122</u>

325.    Collectively, and at the very least, the evidence adduced at trial shows that pressure was not applied to A.C.'s neck sufficient to occlude the jugular veins or cartorid arteries because A.C. did not lose consciousness in double or triple the time necessary for manual strangulation to induce a loss of consciousness. This fact is bolstered by the absence of petechial hemorrhages that are likely to result from the occlusion of the jugular veins.

### iv.  Discoloration Of The Bruises Reveal That The Bruises Were Made Before The Crimes Were Alleged To Occur

326.    Dr. Whaley testified that because the bruising contained tan and yellow discoloration as a result of the body's recycling of the iron contained in the blood of the bruise, that this indicated a <u>minimum</u> lapse of time of (36) hours between the bruises being made and the photographs being taken. <u>PCRA Evi. Hearing Day 4 N.T. 27-29</u>

327.    This evidence directly corroborated Petitioner's version of events, and called into question the credibility of the complainant because (1) the photographs of A.C. were taken (22) hours after the alleged strangulation, (2) A.C. testified that she was with Petitioner on the weekend before the alleged crime <u>T.T. Vol II N.T. 64</u> (i.e., Thursday November, 13th, through Sunday November 16th, 2014, a minimum of 48 hours prior to the day the crimes are alleged to have occurred on Tuesday November 18th, 2014), and A.C. testified that she received the hickey on a prior weekend. <u>T.T. Vol II N.T. 78-79</u>

### B. The Existence Of A Risk of Death Not Present And Was Critical To The Elements Of Aggravated Assault

328.    Dr. Vey's trial testimony is void of any explanation as to exactly how much time is required for strangulation to pose a risk of death. According to Dr. Vey's trial testimony in this case, a loss of consciousness precedes death and death will occur "eventually". <u>T.T. Vol II N.T. 122-123</u>

329.    The length of time necessary to cause a risk of death was emphasized in both the prosecutor's opening and closing arguments to establish the elements of aggravated assault, respectively as follows:

"That's the substantial step. Because [Dr. Vey] will describe how quickly that strangulation can turn into death." <u>T.T. Vol I N.T. 22</u>

...

"You also must find that the strangulation was intentional. When the defendant grabbed Amanda by the neck and pulled her off the bed, that is a substantial step towards serious bodily injury. Dr. Vey explained that to you. It takes seconds [of strangulation] to reach unconsciousness if done with complete closure of the arteries, and <u>it takes less than a minute to die</u>." <u>T.T. Last Day N.T. 95</u>

330.    Even the trial judge was misled as to this fact. In its 1925(a) opinion the trial judge stated "After he hit her twice and <u>nearly strangled her to death</u>." See page 4

331.    Trial counsel should have cross-examined Dr. Vey about the length of time necessary to pose a risk of death and if necessary, trial counsel should have confronted Dr. Vey about his testimony given at other Pennsylvania trials such as at <u>Comm. v. Brandt</u>, 972 A.2d 548, 2009 Pa. Super. LEXIS 1328 (Pa. Super. Ct. 2009)(cited also at <u>Brandt v. Wetzel</u>, 2014 U.S. Dist. LEXIS 76415). In <u>Brandt</u>, Dr. Vey testified as follows:

"It doesn't take too long to lose consciousness, but it does take a while to die and the literature is very clear on this point, that with complete, unremitting, in other words, continual obstruction, of the carotid arteries [requiring 11 pounds of pressure or more], irreversible

brain damage and death requires four to six minutes of unremitting, unrelenting, continual obstruction... so that's the minimum, is four to six minutes." Id. at 198-99

332.     In Brandt, near the conclusion of Dr. Vey's direct testimony, he reiterated that the victim died from being strangled for at least four to six minutes, and not, as the defense claimed to support the "heat of passion" voluntary manslaughter defense to first-degree murder, for a mere (30) seconds (the exact duration of the alleged strangulation in the instant case). In Brandt, Dr. Vey testified as follows:

"Q. Doctor, we talked about the-- we saw the photos of the injuries. Do you have an opinion as to whether or not the injuries, ligature injuries we viewed around the neck of [the victim], could have been caused by someone holding the ligature for a period of 30 seconds?

A. No. Again, if that ligature was only applied for 30 seconds, number one, she wouldn't have died, and, number two, the degree of hemorrhage associated with the application of the ligature would not be as severe."

...

And upon redirect, Dr. Vey testified as follows:

"Q. Asphyxiation. You gave an opinion not 30 seconds, couldn't be 30 seconds?

A. That's correct." T.T. at 226-27, 229-30

333.     Dr. Vey knew that death could not result in 30 seconds. In addition to Dr. Vey's Brandt testimony, in his written report admitted in the instant case, Dr. Vey stated: "Inasmuch as the only difference between a fatal strangulation and this event is the duration of the episode." page 2 of 3

334.     Not only was the jugular veins nor the carotid arteries not occluded as detailed above but according to A.C.'s testimony, she was three and a half minutes short of being at risk of suffering serious bodily injury or death.

335.     At the PCRA evidentiary hearing, Dr. Whaley testified that it is impossible to kill someone via manual strangulation in less than a minute.

76

PCRA Evi. Hearing Day 4 N.T. 31-32  Dr. Whaley testified that death from strangulation takes 3 to 5 minutes. Id. N.T. 29-31

### C. Alternative Theories of Causation Advanced by Trial Counsel Prejudiced The Defense

336.     Trial counsel testified that during attorney-client consultations, Petitioner informed trial counsel that the bruises in question were "hickies". PCRA Evi. Hearing Day 4 N.T. 64

337.     At trial, counsel was ineffective for representing to the jury that the bruising on A.C.'s neck was caused by the lifting of cardboard boxes or the handling of hot plastic. T.T. Vol I N.T. 44-45 and T.T. Vol II N.T. 91-92

338.     In closing argument, the prosecutor attributed these theories to Petitioner when arguing that Petitioner was incredible and should not be believed by the jury. T.T. Last Day N.T. 78, 81, and 82

### D. Trial Counsel's Conduct Amounted to Incompetence

339.     Trial counsel's course of conduct was so unreasonable that no competent lawyer would have followed it and counsel made errors so serious that counsel was not functioning as the "counsel" guarenteed by the Sixth Amendment. Counsel's conduct did not reflect a tactical choice and counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker.

340.     Trial counsel did not consult with an expert to prepare for cross-examination and trial counsel elected not to pose a single question about the scientific basis of Dr. Vey's opinion. Instead, trial counsel briefly

77

questioned Dr. Vey about a simple typographical error found within Dr. Vey's
written report.

341.    Trial counsel testified he didn't believe the marks were
consistent with manual strangulation PCRA Evi. Hearing Day 4 N.T. 61 and had
"no basis" for failing to cross Dr. Vey regarding the scientific basis of his
opinion. Id. N.T. 53

342.    When asked about Dr. Vey's written report that acknowledges
the absence of petechial hemorrhages trial counsel testified "If there is a lack
of a clinical sign, I think that's probably helpful to the defense" Id. N.T. 52,
and testified that he believed Dr. Vey already testified to the lack of petechial
hemorrhages (which Dr. Vey did not) Id.

343.    Trial counsel did attempt to contact a Karl Williams, a expert
Pathologist located in Pittsburgh, however, trial counsel testified that
"the trial was very close at hand, that's when he finally hedged, to my opinion,
that he was not ready to come to court." Id. N.T. 50 Trial counsel waited
almost two years for an expert opinion from Karl Williams without consulting
another expert to prepare for trial or to retain an expert to rebut the
Commonwealth's medical evidence.

344.    There is also evidence that trial counsel failed to educate
himself on fundamental, basic concepts of law that governed this case. It is
axiomatic that charges of criminal attempt require the mens rea of specific-intent.
Because Petitioner was on trial for attempted-aggravated assault based on the
alleged strangulation of A.C., the length of time needed for strangulation to
pose a risk of death was critical to determining whether Petitioner intended to
cause serious bodily. Trial counsel testified "I don't know that that's the law,
no. It may not be sufficient to prove intent. It may be sufficient to prove
knowing conduct or reckless conduct." Id. N.T. 54 and "I agree that to commit
an attempt there has to be intent. I don't know that its a specific intent."

Trial counsel didn't even know the elements of the crimes for which Petitioner was on trial. Id. N.T. 55  See also Supporting Brief

345.      Trial counsel testified that during attorney-client consultations, Petitioner informed him that the marks on A.C.'s neck were hickies and did not tell him they were caused from lifting cardboard boxes or from hot plastic. Id. N.T. 65  Rather than pursue the explanation Petitioner gave counsel and police, that of which was heard by the jury, trial counsel instead relied upon his "imagination" in formulating a defense theory of causation. Id. N.T. 62

346.      Trial counsel's conduct here is a severe deviation from rational thought. The marks were not burn marks that would be caused by "hot plastic" nor would the lifting of cardboard boxes produce bruises. This is contrary to human experience.

347.      Trial counsel admitted he should have objected to the prosecutor attributing these statements to Petitioner when arguing that Petitioner was incredible. Id. N.T. 66  Trial counsel admitted it was not reasonable to infer causation from the lifting of cardboard boxes. PCRA Evi. Hearing N.T. 65

### E.  Petitioner Was Prejudiced By Counsel's Conduct In This Regard

348.      Trial counsel's errors were so serious as to deprive Petitioner a fair trial, whose result is unreliable. Counsel's conduct rendered the proceedings fundamentally unfair.

349.      The medical evidence involved in this case was favorable to Petitioner and trial counsel failed to elicit any helpful testimony from Dr. Vey.

350.      The medical evidence proved that the jugular veins and carotid arteries of A.C. were not occluded, that the bruising lacked all the usual signs of manual strangulation, and that the bruising was made before the

crimes were alleged to have taken place, were entirely consistent with Petitioner's representations that they were hickies, and were consistent with A.C.'s testimony that she received a hickey from Petitioner.

351.    If properly rebutted through effective cross-examination or presentation of a defense expert, the medical evidence seriously called into question A.C.'s account of what happened while simultaneously corroborating Petitioner's account. A.C.'s account is physically impossible. According to A.C., while sitting down, Petitioner grabbed A.C. by her lower neck, without catching his hand under her mandible (and given that A.C. was 5'11 and weighed 170 pounds at the relevant time T.T. Vol II N.T. 96) and lifted A.C. off the bed by her throat, with one hand and without causing more severe bruising.

352.    The Petitioner was prejudiced when the jury was misled to believe that A.C. almost died when the science is that A.C. was no where close to even suffering serious bodily injury, let alone death. If the length of time necessary to pose a risk of serious bodily injury was used in murder cases to establish specific intent to kill, then surely a short length of time is indicative of a lack of specific intent.

353.    Trial counsel further damaged Petitioner's credibility and defense by putting forth a cardboard box/hot plastic theory inconsistent with Petitioner's explanation.

354.    In closing, the prosecutor capitalized on trial counsel's ineffectiveness stating "There is only one thing that exists here, and that is that man strangled that girl. That's why they didn't ask. Because they knew the answer and they didn't like the answer." T.T. Last Day N.T. 81 and "None of these additional methods that he described were asked by Dr. Vey..." Id. N.T. 90

GROUND V

355.    Petitioner was denied his 14th Amendment right to have a jury
determine his guilt beyond a reasonable doubt of every fact necessary
to constitute the crimes of Rape by Forcible Compulsion (or threat
thereof), Kidnapping, and Attempted Aggravated Assault and Petitioner
was denied his right to effective assistance of counsel where
appellate counsel filed a constitutionally inadequate brief on appeal
in regards to Petitioner's sufficiency claims and where trial
counsel failed to advance a challenge to Pennsylvania's Rape Statute
on grounds that the statute was void-for-vagueness as applied to
the facts of this case in violation of the U.S. Constitution and its
laws.

356.    At trial, the Commonwealth did not prove beyond a reasonable
doubt that Petitioner committed the crimes of Rape by Forcible Compulsion
(or threat thereof), Kidnapping, nor Attempted-Aggravated Assault.

357.    Trial counsel and appellate counsel rendered ineffective assistance
of counsel by failing to advance argument particular to the elements not met
by the evidence.

A.  Rape By Forcible Compulsion or Threat Thereof

358.    This case involves a novel rape theory where the facts
established at trial demonstrated that during the alleged criminal episode there
was (1) no allegation of physical force used to compel the complainant to engage
in sexual intercourse, (2) no allegation that there was any employment of
verbal threats used to compel the complainant to engage in sexual intercourse,

(3) no communication from the complainant that she was unwilling to engage in sexual intercourse, (4) verbal consent was inquired into by the Petitioner and, at the very least, appeared to be given, and (5) there was a four-hour period of time between the alleged assaultive behavior and the sexual encounter, during the time of which the overall atmosphere changed, things calmed down T.T. Vol II N.T. 56, Petitioner became apologetic Id. N.T. 55, and laughing and joking occurred between the complainant and the Petitioner. Id. N.T. 56

359.    The Commonwealth failed to prove that Petitioner intentionally and objectively used force or the threat of force to compel the complainant to engage in sexual intercourse. No evidence adduced at trial established that force was expressed or implied by the Petitioner for the purpose of facilitating the act of sexual intercourse.

360.    The trial record is void of any threat of force, expressed or implied by Petitioner, that would deter a "person of reasonable resolution" from resisting. The complainant simply had no reason to believe that had she declined to engage in sexual intercourse, that Petitioner intended to use force. A "person of reasonable resolution" would not believe they were in danger of being raped.

361.    A.C. testified that she consented because she "felt that I had no other choice, that if I would have, he could have taken it from me forcefully." T.T. Vol II N.T. 56 and 99  However, this was not a feeling or belief intentionally induced or communicated by the Petitioner.

362.    Petitioner's conviction is premised upon what he "could have" done, not what he, in fact, did.

363.    A.C. testified that, during the sexual encounter, "I guess I was kind of scared he was going to do something, I'm not sure what." T.T. Vol II N.T. 98  A.C. didn't know what Petitioner might do because Petitioner did not, in any way, communicate to A.C. that she would be raped.

364.    Therefore, the Commonwealth failed to prove beyond a reasonable doubt that Petitioner formed the mens rea for this offense nor the element of forcible compulsion.

### i.  The Rape Statute Is Void-For-Vagueness As Applied to the Facts of This Case

365.    Only in the alternative to Petitioner's sufficiency claim regarding Rape by Forcible Compulsion, trial counsel was ineffective for failing to advance a challenge to the Rape Statute on grounds that the statute is void-for-vagueness as applied to the facts of this case.

366.    Petitioner did not receive fair notice that his conduct was unlawful and Petitioner had no reason to believe or know that the accuser was forcibly compelled to engage in sexual intercourse merely because Petitioner is alleged to have committed a domestic assault on the same day as the act of sexual intercourse.

367.    No where in Pennsylvania's decisional law has a simple assault been bootstrapped up to a rape merely because an assault is alleged to have occurred on the same day as an act of sexual intercourse-- without a showing that the two acts were part of the same transaction.

### B.  Attempted Aggravated Assault

368.    The Commonwealth failed to prove beyond a reasonable doubt that Petitioner took a "substantial step" towards inflicting serious bodily injury and that Petitioner formed the specific-intent to cause serious bodily injury upon the complainant.

369.    Both the trial judge and the prosecution agreed that there was no

serious bodily injury in this case and that the facts of the case were best characterized as an "attempt". <u>Sentencing Hearing of March 14, 2017 N.T. 3</u>

370.    Contrary to Pennsylvania Law, the trial court and the Commonwealth below relied upon the fact that the alleged assault involved a vital part of the human body, i.e. the neck, to establish that Petitioner had the requisite intent to cause SBI and to establish that Petitioner took a substantial step towards SBI. See <u>Supporting Brief</u>

371.    Evidence adduced at trial demonstrated that Petitioner was not restrained from escalating his attack had he had intentions to do so, Petitioner had no weapon or other implement to aid his attack, and Petitioner made no statements before, during, or after the attack which might indicate his intent to inflict further injury upon the complainant. Moreover, the complainant testified that when she asked Petitioner to stop, Petitioner did so. <u>T.T. Vol II N.T. 52</u>

372.    In addition to failing to prove Petitioner's specific-intent, the Commonwealth failed to prove that grabbing a person by the throat for (30) seconds constituted a substantial step towards SBI. This is especially so considering that strangulation must last for a duration of 4-6 minutes before there becomes a risk of SBI, that of which the Commonwealth's expert knew but failed to testify regarding because it would have been damaging to the Commonwealth's case. See <u>Supporting Brief</u>

### C. Kidnapping

373.    The Commonwealth failed to prove that the complainant was removed from the protections of society to such a degree that discovery and rescue would be unlikely, and thus, the element of "a place of isolation" was not proven beyond a reasonable doubt.

84

374.    Evidence adduced at trial demonstrated that the complainant (1) was not bound in any fashion, (2) left the bedroom unaccompanied by the Petitioner where she crossed paths with another occupant of the dwelling, (3) there were other occupants within the dwelling, and (4) the complainant was left alone with her working cellphone and therefore, the complainant was not removed from the normal protections of society that would render escape or rescue unlikely.

## D. Trial and Appellate Counsel's Conduct Amounted to Incompetence

375.    Trial and appellate counsel's course of conduct was so unreasonable that no competent lawyer would have followed it and counsel made errors so serious that counsel was not functioning as the "counsel" guarenteed by the Sixth Amendment. Counsel's conduct did not reflect a tactical choice and counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker.

376.    First, during the PCRA proceedings, Appellate Counsel had a serious case of amnesia. When asked about the basis of his choices and omissions, Appellate Counsel testified he could not recall atleast (19) times. PCRA Evi. Hearing Day 3 N.T. 167-195

377.    Direct Appeal Counsel confused facts of the case and grossly misquoted the evidence. In his appellate brief, counsel repeatedly misstated that the choking occurred during the sexual encounter Appellate Brief, page 11 (a false belief shared with trial counsel)(the alleged choking event occurred (4) hours prior to the sexual encounter), mistakenly asserted that the Commonwealth contended that the Petitioner choked the victim causing serious bodily injury Appellate Brief, page 15 (No SBI present in this case), mistakenly alleged that Petitioner's cellphone contained an audio recording that countered the April 11th audio played at trial Appellate Brief, page 21, mistakenly asserted that the

85

404(b) witness gave false testimony at the 404(b) hearing <u>Appellate Brief, pages 21 and 24</u> (no witness testified at the 404(b) hearing of July 10th, 2015), and mistakenly asserted that C.D. testified at the PFA hearing that marks on her neck were from rough sex, <u>Appellate Brief, page 24</u> (C.D. never alleged to have marks on her neck, only A.C. had marks on her neck and neither C.D. nor A.C. claimed they were caused by rough sex).

378.    In addition to not having the facts of the case right, Direct Appeal Counsel failed to develop any argument that compared Pennsylvania case law to the facts of this case beyond mere recitation of the elements of the crimes of Rape by Forcible Compulsion and Kidnapping. As to Attempted Aggravated Assault, Appellate Counsel cited no case-law whatsoever.

379.    As to the charge of rape, Appellate Counsel agreed that "there was nothing at the time [of the sexual intercourse] that showed that you were coercing her" <u>PCRA Evi. Hearing Day 3 N.T. 174</u>, and that a threat must be communicated to the victim <u>Id. N.T. 175</u>, but had no basis for failing to invoke <u>Comm. v. Berkowitz</u> or Pennsylvania's Statutory Construction Act. <u>Id. N.T. 175</u>

380.    As to the charge of Kidnapping, Direct Appeal Counsel agreed that if A.C. had access to her cellphone and if other people were present within the dwelling that the normal protections of society would be available to her and discovery and rescue would be likely, <u>Id. N.T. 178</u> but had no basis for not invoking <u>Comm. v. Green</u> (Super. 2016) or <u>Comm. v. Hook</u> (1986) <u>Id. N.T. 178</u>

381.    As to the charge of Attempted-Aggravated Assault, Direct Appeal Counsel was not sure if Petitioner was convicted of Aggravated Assault or an Attempt thereof <u>Id. N.T. 179</u> and thus did not know the elements of the offense or argue the insufficiency thereof, that is, the mens rea of the offense and the "substantial step" element of attempted-aggravated assault.

382.    Trial counsel testified he had no basis for failing to object that the rape statute was unconstitutional on grounds that it was void-for-vagueness.

PCRA Evi. Hearing Day 4 N.T. 85

### E.   Petitioner Was Prejudiced By Trial and Appellate Counsel's Failures

383.    Trial and Appellate Counsel's errors were so serious as to render the proceedings fundamentally unfair.

384.    Petitioner was charged and convicted under Pennsylvania's Rape Statute that, as applied to the facts of this case, is void-for-vagueness as it failed to provide Petitioner fair notice that his conduct constituted rape by forcible compulsion. Had counsel advanced this claim, there is a likelihood that Petitioner would have not been tried for the rape of A.C..

385.    Petitioner was deprived of meaningful appellate review on direct appeal regarding Petitioner's sufficiency claims. Had Appellate Counsel adequately reviewed the case file and governing case-law in preparation for Petitioner's appellate brief, there existed a likelihood of success on appeal based upon strong Pennsylvania precedent specific to the issues of this case that would have likely resulted in Petitioner having his convictions and sentences vacated regarding to the charges of Rape, Kidnapping, and Attempted Aggravated Assault.

### GROUND VI

386.    Petitioner was denied his right to effective assistance of counsel, the right to a fair trial and to due process, the right to prepare a full defense, his right to make an informed decision whether or not to testify in his defense, and his right to assist in his own defense where the prosecution enforced a policy that conditioned discovery upon the understanding that no case related documentation

87

would be left in the possession of Petitioner and where trial counsel failed to adequately review discovery with Petitioner nor object to the enforcement of said policy which interfered with trial counsel's assistance in violation of the U.S. Constitution and its laws.

387.    Since Petitioner's arrest, and until long after Petitioner's conviction, the Mercer County District Attorney's Office enforced a no-discovery policy which conditioned discovery upon the understanding that no case-related documentation would be left in the possession of Petitioner.

388.    This policy not only applied to discovery materials and the evidence the Commonwealth possessed against Petitioner, but also applied to public documents such as court opinions, orders, motions filed by either party, and transcripts.

389.    The President Judge of Mercer County, the Mercer County District Attorney, and Erna Craig, the Warden of the Mercer County Prison, all served on the prison board at the relevant time and participated in the enforcement of this policy at the Mercer County prison where Petitioner was housed prior to trial. PCRA Exhibit 42

390.    Trial counsel testified that Petitioner requested the case-related documentation, including discovery, and requested that these materials be mailed to Petitioner, but was refused by counsel. PCRA Evi. Hearing Day 1 N.T. 17

391.    Trial counsel testified that his withholding of these documents was due to the Commonwealth's conditional disclosure. Id. N.T. 16

392.    Trial counsel testified that if the county policy permitted him to, he would have left the material with Petitioner for Petitioner to review on his own time. PCRA Evi. Hearing Day 5 N.T. 51

393.    Trial counsel testified that he did not bring the Facebook records

88

in full Id. Day 1 N.T. 40, the cellphone extraction report, the April 11th audio Id. Day 2 N.T. 56, nor the Trollman Emails Id. Day 4 N.T. 78 to the county prison for Petitioner to review.

394.    Petitioner's PCRA Exhibit 39 is a collection of right-to-know requests after Petitioner's trial where Petitioner unsuccessfully attempted to obtain various case-related documentation, indicating Petitioner did not possess this documentation and was unsuccessful in obtaining this documentation from trial counsel.

395.    Petitioner's PCRA Exhibit 37, and 38, evidences the fact that Petitioner sought to adequately review discovery long before his trial and immediately before his trial, but was denied by the counselor and deputy warden of the Mercer County Prison who cited to the D.A.'s policy.

396.    Petitioner's PCRA Exhibit 36, evidences the fact that Petitioner addressed these concerns to the President Judge Dobson who also cited to the D.A.'s policy.

397.    Appellate counsel testified that once he began to represent Petitioner during post-sentence motions, that Petitioner complained to him that Petitioner wished to view the discovery and that Petitioner felt he did not have real and meaningful access to the material. PCRA Evi. Hearing Day 2 N.T. 95 and Day 3 N.T. 170

398.    Appellate counsel testified that he had mailed discovery to some of his other clients but later learned that the package was never delivered to the client at the Mercer County Prison due to this county policy. PCRA Exhibit 40 N.T. 9 and PCRA Evi. Hearing Day 2 N.T. 96

399.    Trial counsel would not mail case-related documentation to Petitioner while Petitioner was housed at the Mercer County Prison because he knew the privileged mail would be intercepted and disposed of in accordance to this policy.

## A. Trial Counsel's Conduct Lacked Any Strategic Basis and Amounted To Incompetent

400.    Trial counsel's course of conduct was so unreasonable that no competent lawyer would have followed it and trial counsel made errors so serious that counsel was not functioning as the "counsel" guarenteed by the Sixth Amendment. Trial counsel's conduct did not reflect a tactical choice and rendered the proceedings below fundamentally unfair.

401.    Trial counsel's only reason for adhering to this policy was that he wished to comply with the standing practice in the county. Trial counsel's adherence to this policy served no legitimate purpose, had no binding legal force upon trial counsel, and only served the interests of the Commonwealth while working egregiously against Petitioner's interests.

402.    Trial counsel made no objection to the enforcement of this policy against Petitioner in this case. Trial counsel never brought this issue to the attention of the court in an attempt to seek an alternative arrangement or compromise. Instead, trial counsel deprived Petitioner access to the evidence and failed to keep Petitioner abreast of the developments within his case and review discovery and court filings with Petitioner.

## B. Cronic And Strickland Prejudice

403.    Petitioner asserts that prejudice should be presumed because this policy constituted an actual or constructive denial of counsel, created circumstances where competent counsel very likely could not render effective assistance, prevented counsel from assisting the Petitioner, prevented vital communication between Petitioner and his counsel, interfered with Petitioner's ability to understand the proceedings, rendered Petitioner constitutionally

90

absent, prevented Petitioner from assisting in his defense, and trial counsel failed to subject the Commonwealth's case to any meaningful adversarial testing. See Supporting Brief

404.   This state created policy is inherently detrimental to criminal defendants, unfairly advantages the prosecution, and subverts the adversarial system of criminal justice.

405.   The policy prevented counsel from freely sharing documentation with Petitioner, forcing counsel to supervise Petitioner while he read or studied voluminous documentation. This arrangement constructively deprived Petitioner adequate review of the evidence and created a circumstance where no lawyer would likely be capable of rendering effective assistance because trial counsel had limited time due to his other obligations and duties, Petitioner would be forced to skim documents due to the short duration of attorney-client consultations, the case file was complex and voluminous, and Petitioner could not compare older discovery to newer discovery as the case progressed.

406.   Trial counsel testified to these restraints as follows:

"it would be difficult for any lawyer, because it was a big stack of messages-- text messages from the cellphones to review. And yes, that would have been-- if I entered-- go over them with you in person at the jail, that would have taken hours perhaps. So, yes, it would have been easier for me to leave those. Would I have liked to have left those with you, yes, obviously, to give you a chance to go over them, but I couldn't. I was-- I was not permitted by the policy to leave them with you, and that's the situation. And-- and that's the situation. Would it have been to your advantage to have those e-mails with you to examine? Certainly." PCRA Evi. Hearing Day 5 N.T. 51

407.   If this Court finds this violation to be attributable to the state, Cronic should apply. Alternatively, Petitioner asserts that Strickland prejudice is also demonstratable in this case.

     i.   In Joint Conspiracy With The Prosecution, Trial Counsel

       Used This Policy To Railroad the Petitioner And Ensure

Petitioner's Conviction

408.    Petitioner asserts, and not lightly, that trial counsel assisted the prosecution in obtaining Petitioner's conviction by using this policy to conceal prosecutorial misconduct, trial counsel's ineffectiveness and/or collusion, and evidence favorable to Petitioner's defense.

409.    During Petitioner's three year stay at the Mercer County Prison, Petitioner have experienced (and in some instances, kept record of) countless times where a Mercer County Public Defender would outright lie to their client about evidence in the Commonwealth's possession (such as recorded phonecalls where the client makes incriminating statements) while simultaneously advising the client to plead guilty. Once the client requested to view this evidence, the public defender would deny the request, citing to the D.A.'s policy and then abandon advising the client to plead guilty. These occurances occurred so often, that Public Defenders began becoming erate in open court when clients requested to review discovery.

410.    Petitioner attempted to admit evidence of this during his PCRA proceedings but was not permitted to by the court. Petitioner possesses evidence that he is prepared to submit to this Court in the event that this Court wishes to conduct an evidentiary hearing on this matter.

411.    Petitioner vehemently asserted his innocence throughout this case and because Petitioner would not enter a plea, trial counsel utilized this policy to railroad the Petitioner. Petitioner asserts the record supports this fact.

412.    Trial counsel, Charles Gilchrest, is an aged and experienced lawyer who testified that he had been practicing criminal law since 1973 ( Fifty years as of the date this Petition was executed). PCRA Evi. Hearing Day 1 N.T. 11-12  Petitioner asserts that trial counsel's errors in this case, as

92

detailed throughout this petition, are so obvious, fundamental, and inconsistent with counsel's level of experience, that these errors could only be the result of collusion and orchestration.

413.    Trial counsel served as gatekeeper between Petitioner and the state's evidence against Petitioner. The evidence underlying and supporting each claim of constitutional error raised in this petition, was evidence that trial counsel would not permit Petitioner to review prior to trial when citing to the county's no-discovery policy.

414.    Trial counsel would not permit Petitioner to inspect the prosecution's 404(b) motion that contained the prosecutorial fraud as detailed in Ground I PCRA Evi. Hearing Day 6 N.T. 89, discussion and/or argument concerning the 404(b) issue was held in Petitioner's absence within the judge's chambers while Petitioner sat in the jury box Transcript of 404(b) Hearing of July 10th, 2015, when the 404(b) issue reached the Superior Court on interlocutory appeal, trial counsel filed an appeal under a procedurally improper rule despite his knowledge of the proper procedure, and when trial counsel brought the interlocutory opinion of the Superior to Petitioner at the County Prison, he only brought the first portion of the opinion, omitting the parts of the opinion that addressed trial counsel's failures (i.e., pages 26-29 of the opinion), and when Petitioner asked counsel for the rest of the opinion, trial counsel stated "Policy doesn't allow it." PCRA Evi. Hearing Day 6 N.T. 18 and 95-96  All of these facts point to trial counsel's efforts in facilitating the prosecution with admitting C.D.'s testimony which led to Petitioner's conviction.

415.    During attorney-client consultation, trial counsel informed Petitioner that the April 11th audio recording would not be presented at Petitioner's trial. Instead, trial counsel represented to Petitioner that only a transcript of this audio would be presented at trial.

416.    Although Petitioner was permitted to read this "transcript" of

the April 11th audio, this "transcript" was disorganized, inaccurate, duplicated several sections and was not certified by any stegnographer. This "transcript" was admitted as a Commonwealth Exhibit (# 24) at the July 10th, 2015, 404(b) hearing without objection by counsel, to persuade the trial court to admit the April 11th audio at trial which was ultimately incriminating but fabricated evidence. The prosecution knew the trial judge would likely read the transcript rather than listen to the audio.

417.    The transcript contains incriminating language that does not appear in the April 11th audio. The very existence of this altered transcript shows that the prosecution assisted C.D. in misrepresenting this audio as evidence that Petitioner assaulted C.D. in her vehicle on the car ride home from the swing dance.

418.    Trial counsel's failures to object to this inaccurate, uncertified transcript and trial counsel's refusal to permit Petitioner to listen to the actual audio recording prior to trial despite Petitioner's requests, is evidence of trial counsel's collusion with the prosecution. The alterations are clearly discernable and are listed as follows:

a) On page 1, line 2, the transcript represents that Petitioner said "Why the fuck did I do this?" The audio reveals Petitioner said "Why the fuck did I do that?" (While this may appear insignificant, the word "this" makes it appear, without being subject to interpretation, that Petitioner was speaking about something that just happened)

b) Again, on page 1, line 4, the transcript reads "Why did I fucking do this? Oh my God, I fucking hurt you." The audio reveals instead, that Petitioner said "Shit man, why did I fucking do that?"

c) On page 4, line 19, the transcript reads "You are scaring me. I know____." The audio reveals C.D. saying "I don't. I know it was the first..." (audio at 17:33)

d) On page 5, line 20, the transcript reads "I didn't do anything. Get off me. I'm_____ (crying)" Instead, the audio reveals that C.D. asked Petitioner to hug her (audio at 22:11), that Petitioner (when hugging C.D.) said "You smell good." and that C.D. said "I'm not clean, get off me. I'm self-conscious" and then laughs (audio at 22:59)(C.D. mentions during the audio that she needed to shower after dancing)

94